Javier Vasquez-Velasco
**NAME**

Reg. No. 91039-012
**PRISON IDENTIFICATION/BOOKING NO.**

USP-Victorville, P.O.BOX 3900
**ADDRESS OR PLACE OF CONFINEMENT**

Adelanto, CA 92301

Note:   If represented by an attorney, provide name, address & telephone
number. *It is your responsibility to notify the Clerk of Court in
writing of any change of address.*



**FILED**
CLERK, U.S. DISTRICT COURT

11/7/2016

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CS _____ DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

JAVIER VASQUEZ-VELASCO,

Petitioner.

**FULL NAME OF MOVANT**
(Include name under which you were convicted)

CASE NUMBER:

**CV**   CV16-9685 JAK
To be supplied by the Clerk of the United States District Court

**CR**   87-cr-0422-JAK
Criminal case under which sentence was imposed.

**MOTION TO VACATE, SET ASIDE OR
CORRECT SENTENCE BY A PERSON IN
FEDERAL CUSTODY
28 U.S.C § 2255**

## INSTRUCTIONS - READ CAREFULLY

This motion must be legibly handwritten or typewritten and signed by the movant under penalty of perjury. Any false statement of a material fact may serve as the basis for prosecution and conviction for perjury. All questions must be answered concisely in the proper space on the form. Where more room is needed to answer any questions use reverse side of sheet.

Additional pages are not permitted. No citation or authorities need be furnished. If briefs or arguments are submitted, they should be submitted in the form of a separate memorandum.

Upon receipt, your motion will be filed if it is in proper order. **NO FEE** is required with this motion

If you do not have the necessary funds for transcripts, counsel, appeal, and other costs connected with a motion of this type, you may request permission to proceed in forma pauperis, in which event you must execute the declaration on the last page, setting forth information establishing your inability to pay costs. If you wish to proceed in forma pauperis, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account in the institution.

Only judgments entered by one court may be challenged in a single motion. If you seek to challenge judgments entered by different judges or divisions either in the same district or in a different districts, you must file separate motions as to each judgment.

Your attention is directed to the fact that you must include all grounds for relief and all facts supporting such grounds for relief in the motion you file seeking relief from any judgment of conviction.

When the motion is fully completed, the original and three (3) copies must be mailed to the Clerk of the United States District Court, whose address is 312 North Spring Street, Los Angeles, California 90012.

## MOTION

1. Name and location of court which entered judgment of conviction under attack: __United States District Court for the Central District of California, Los Angeles, California.__

2. Date of judgment of conviction: __May 23, 1991__

3. Length of sentence: __two consecutive life__   Sentencing judge: __Edward Rafeedie.__

4. Nature of offense or offenses for which you were convicted: __Violating 18 USC §1959: aiding and abetting murder in aid of racketeering__

5. What was your plea? *(check one)*

   ☒ Not guilty
   ☐ Guilty
   ☐ Nolo Contendere

   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

6. Kind of trial: *(check one)*

   ☒ Jury
   ☐ Judge only

7. Did you testify at the trial?

   ☐ Yes      ☒ No

8. Did you appeal from the judgment of conviction?

   ☒ Yes      ☐ No

9. If you did appeal, answer the following:

(a) Name of court ___United States Court of Appeals for the Ninth Circuit.___

(b) Result ___Affirmed.___

(c) Date of result ___January 25, 1994___

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any federal court?

☒ Yes   ☐ No

11. If your answer to question number 10 was "yes", give the following information:

(a) (1) Name of Court ___United States District Court for the Central District of California.___

(2) Nature of proceeding ___28 USC 2255 and related motion for new trial, both filed on November 10, 1997.___

(3) Grounds raised (1) the government suborned perjury of Cervantes-Santos at trial;(2) the gov. withheld evidence; and (3) newly evidence.

(4) Did you receive an evidentiary hearing on your petition, application or motion?

☒ Yes   ☐ No

(5) Result ___Motions denied.___

(6) Date of result ___March 10, 1999___

(b) (1) Name of Court _____

(2) Nature of proceeding _____

(3) Grounds raised _____

(4) Did you receive an evidentiary hearing on your petition, application or motion?

☐ Yes   ☐ No

(5) Result _____

(6) Date of result _____

(c) (1) Name of Court _____

(2) Nature of proceeding _____

(3) Grounds raised _____

(4) Did you receive an evidentiary hearing on your petition, application or motion?

☐ Yes   ☐ No

(5) Result _____

_____

(6) Date of result _____

(d) Did you appeal, to an appellate federal court having jurisdiction, the results of action taken on any petition, application or motion?

(1) First petition, etc.   ☒ Yes ☐ No

(2) Second petition, etc. ☐ Yes ☐ No

(3) Third petition, etc.  ☐ Yes ☐ No

(e) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

Denial of §2255 and related motion for New trial on February 23 and March 10, 1999.

_____

_____

_____

_____

12. State concisely every ground on which you claim that you are being held unlawfully.

**CAUTION:** If you fail to set forth all grounds in this motion, you may be barred from presenting additional grounds at a later date. For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded letter constitutes a separate ground for possible relief. You may raise any grounds which you have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

If you selected one or more of these grounds for relief, you must allege facts in support of the grounds listed below. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A.  Ground one: __Vasquez__  was convicted based on the false testimony and evidence provided during the trial testimony of FBI Agent and hair and fiber examiner Michael Malone.

Supporting facts (tell your story briefly without citing cases or law): __Please see the accompanying memorandum of points and authorities.__

B.  Ground two: _____

Supporting facts (tell your story briefly without citing cases or law): _____

C.  Ground three: _____

Supporting facts (tell your story briefly without citing cases or law): _____

D.  Ground four: _____

Supporting facts (tell your story briefly without citing cases or law): _____

13. If any of the grounds listed in 12 A, B, C and D were not previously presented, state briefly what grounds were not presented, and give your reasons for not presenting them: __The claim above was not previously presented__ because Vasquez, was unaware of the factual and legal bases for the claim.

14. Do you have any petition or appeal now pending in any court as to the judgment under attack?

☐ Yes     ☒ No

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attached herein:

(a) At a preliminary hearing: Gregory Nicolaysen, 8530 Wilshire Blvd., Ste. 404, Beverly Hills, CA 90211

(b) At arraignment and plea: Same.

(c) At trial: Same.

(d) At sentencing: Same.

(e) On appeal: Same.

(f) In any post-conviction proceeding: Same.

(g) On appeal from any adverse ruling in a post-conviction proceeding: Same.

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court at approximately the same time?

☒ Yes ☐ No

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

☐ Yes ☒ No

(a) If so, give the name and location of the court which imposed sentence to be served in the future: _____

(b) Give the date and length of sentence to be served in the future: _____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed sentence to be served in the future?

☐ Yes ☒ No

WHEREFORE, movant prays that the court grant him all relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on  11-7-2016
                    Date

_____
Signature of Movant

# EXHIBIT 3

Javier Vasquez-Velasco
Reg. No. 91039-012
United States Penitentiary
P.O.Box 3900
Adelanto, CA 92301


UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA, )    CASE NO. 87-cr-0422-JAK

              Plaintiff, )

VS. )

                    )

JAVIER VASQUEZ-VELASCO,   )

             Defendant. )

_____)


JAVIER VASQUEZ-VELASCO'S MEMORANDUM OF POINTS AND AUTHORITIES

IN SUPPORT OF HIS MOTION TO VACATE OR SET ASIDE HIS SENTENCE

UNDER 28 U.S.C. §2255

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................. ii

INTRODUCTION.......................................... 1

RELEVANT BACKGROUND................................... 5

    A. Introduction...................................... 5

    B. The Government's Trial Evidence................... 6

        1. Introduction................................. 6

        2. Testimony of Agent Malone.................... 7

           a. Evidence Collected....................... 7

           b. Malone's Opinions....................... 10

        3. Testimony of Hector Cervantes-Santos........ 16

           a. Introduction........................... 16

           b. The Buying of Cervantes's Testimony.... 19

           c. Inconsistencies In Cervantes's Testimony..... 21

        4. The Government's Closing Argument............ 25

    C. Office of Inspector General's July 2014 Report..... 29

    D. October 17, 2014 Letter From DOJ Special Counsel

Norman Wong............................................ 36


THE COURT SHOULD VACATE VASQUEZ'S CONVICTIONS BECAUSE

MALONE'S "INVALID" TESTIMONY WAS KEY TO THE GOVERNMENT'S CASE

    A. Introduction..................................... 40

    B. Relevant Law..................................... 40

    C. Relief Is Warranted.............................. 42

REQUEST TO COMPEL DISCOVERY............................ 49

CONCLUSION............................................. 51

Exhibits A, B, C, D, E

TABLE OF AUTHORITIES

FEDERAL CASES

Boyd v. French, 147 F.3d 319 (4th Cir. 1998)............... 42

Bradcy v. Gramley, 520 U.S. 899 (1997)..................... 50

Curran v. State of Delaware, 259 F.2d 707 (3d Cir. 1958).... 42

Hall v. Director of Corrections, 343 F.3d 976 (9th Cir.
2003)...................................................... 42

Harris v. Nelson, 394 U.S. 286 (1969)..................... 49

Hayes  v. Brown, 399 F.3d 972 (9th Cir. 2005).......... 40,41,44

Killian v. Poole, 282 F.3d 1204 (9th Cir. 2002).......... 41,42

Maxwell v. Rose, 628 F.3d 486 (9th Cir. 2010)......... 40,41,42

McDaniel v. U.S. District Court, 127 F.3d 886 (9th Cir.
1997)..................................................... 45,50

Napue v. Illinois, 360 U.S. 264 (1959)..................... 40

Pham v. Terhune, 400 F.3d 740 (9th Cir. 2005)............. 50

United States v. Jackson, 513 F.3d 1057 (9th Cir. 2008)... 41,42

United States v. Vasquez-Velasco, 15 F.3d 833, 838 (9th Cir.
1994)....................................................... 7

United States v. Melchor-Lopez, 627 F.2d 644 (9th Cir.
1980)..................................................... 23,44

United States v. Young, 17 F.3d 1201 (9th Cir. 1994)......... 41

FEDERAL STATUTES

28 U.S.C. §2255................................... 4,5,38,40,45

FEDERAL RULES

Fed. R. Crim. P. 6(a)..................................... 50

MISCELLANEOUS

14 DOJ/FBI Review......................................... 38

INTRODUCTION

This case stems from the murders of John Walker and Alberto Radelat at the La Langosta restaurant on January 30, 1985, and the kidnapping, torture and murder of DEA Special Agent Enrique Camarena and his Mexican pilot, Alfredo Zavala-Avelar, in Guadalajara, Jalisco, Mexico in February 1985. Eight Indictments were returned in this case against twenty-two defendants.

The indictment alleged in counts one and two of the ten count indictment, that Vasquez had participated in the murders of Walker and Radelat "for the purpose of maintaining and increasing the positions of an enterprise that engaged in racketeering activity." In the General Allegations section of the indictment, that enterprise is alleged to be an entity loosely defined in the indictment as the "Guadalajara narcotics cartel" ["cartel"].

Counts one and two alleged substantive violations of section 1959 in connection with the deaths of Walker and Radelat at the La Langosta restaurant. Counts three through ten charge violations of the conspiracy statute, along with section 1959 and other substantive statutes in connection with the alleged murders of DEA agent Enrique Camarena-Salazar and Alfredo Zavala-Avelar during the time period February 7-9, 1985.

In essence, the cartel is alleged  to comprise the organizational framework through which all of the offenses charged in the indictment were also committed. The general attribution of responsibility to the cartel alleged a nexus between the Walker/Radelat and Camarena/Zavala homicides,

-1-

since the two pairs of homicides are charged  under the same statutory rubric (section 1959) and were alleged to have occurred one week apart.

In 1990, after the district court denied his motion for severance, Vasquez went to trial together with co-defendants Juan Ramos Matta-Ballesteros ("Matta"), Ruben Zuno-Arce ("Zuno") and Juan Jose Bernabe-Ramirez ("Bernabe"). Unlike the case against Vasquez, the charges against Matta, Zuno and Bernabe did not pertain to the La Langosta murders but dealt, instead, with the highly publicized kidnapping and murder of Drug Enforcement Agent Enrique Camarena and his civilian assistant, which occurred on or about February 7, 1985. It was the Camarena connection that cause Vasquez's case to gain publicity in the media and earn the title, the "Camarena case."

The trial was held from May-July 1990 before the Honorable Edward Rafeedie. The government's evidence at trial concentrated almost entirely on the Camarena abduction/murder and only a minute portion of the evidence  presented was directed to the Walker/Radelat murders. The vast majority of the government's case dealt specifically with the Camarena/Zavala homicides.

Hector Cervantes-Santos testified on behalf of the government, and implicated Vasquez, among others, in the conspiracy to kidnap Agent Camarena. At trial, the government relied in large part on the testimony of FBI Agent Michael Malone, a Senior Examiner in the FBI Laboratory's Hair and Fibers Unit.

In August 1990, Vasquez was convicted of aiding and

-2-

abetting murder in furtherance of a racketeering enterprise in violation of 18 USC § 1959. In May 1991, the court sentenced Vasquez to two consecutive sentences of life imprisonment.

In a letter dated November 26, 2014 (Exhibit A), an attorney with the United States Department of Justice, Monica Perez Roth, advised Vasquez that Malone's work and credibility had been called into question in a July 2014 report issued by the Office of Inspector General (OIG) for the Department of Justice (DOJ). That report, An Assessment of the 1996 Department of Justice Task Force Review of the FBI Laboratory (2014 OIG Report), is the OIG's third report related to "irregularities" in the FBI lab. (Available on-line at https://oig.justice.gov/reports/2014/e1404.pdf.). In the 2014 Report, the OIG concluded that throughout his tenure at the FBI, Malone "repeatedly created scientifically unsupportable lab reports and provided false, misleading, or inaccurate testimony at criminal trials." Id. at 7,45. The Report also found that the DOJ should have taken more effective steps to deal with this problem years earlier:

> We believe the [DOJ] should have directed the Task Force [set up in 1996 to look into problems at the FBI lab] to review all cases Malone handled at any point during his tenure in the FBI Lab beginning in 1975, whether as a primary, secondary, or confirming examiner, where the evidence was deemed material to the defendant's conviction. A discussion about potential scope expansion should have occurred no later than fall 1999, since the FBI and the Department learned in May and July 1999, respectively, after the glaring findings by the independent scientists [hired by the FBI], that Malone's forensic analysis and testimony were unreliable.

Id. at 72. Shortly before the OIG's Report was issued, the DOJ and FBI began this long overdue review of Malone's work.

See id. at 134. With respect to that process, in her November

26, 2014 letter to Vasquez, Ms. Roth wrote:

> [T]he Department of Justice is currently reviewing certain
> historic cases in which FBI laboratory results or testimony
> regarding microscopic hair comparison analysis were utilized.
> If your case is subject to that review, the Department may
> contact you separately regarding that review.

11/26/14 Roth Letter (Exhibit A).

As of the writing of this application, the DOJ has not

notified Vasquez that it has completed such a review. But the

DOJ has notified only one of Vasquez's co-defendants in this

case, Rene Martin Verdugo-Urquidez, that it has completed

such a review. Verdugo was convicted two years earlier than

Vasquez, in a separate trial. Malone's testimony was, in all

relevant respects, the same in both trials. Thus, the DOJ's

findings, and positions, with respect to Verdugo's case

should be the same for Vasquez's case.

Verdugo's trial counsel, Michael Pancer, was notified of

the Malone review for Verdugo's case in an October 17, 2014

letter from DOJ Special Counsel Norman Wong. Mr. Wong advised

Mr. Pancer that the DOJ had recently reviewed Malone's

testimony in Verdugo's trial, and based on that review the

DOJ repudiated the hair testimony that placed Verdugo and

Agent Camarena (and a third man, Sergio Espino-Verdin) at the

Guadalajara guest house. See 10/17/14 Wong/Pancer Letter &

Att.(Exhibit B). Mr. Wong also wrote that while the DOJ would

not presently take a position on the materiality of Malone's

testimony in Verdugo's trial, "in the interest of justice,

the United States is waiving reliance on the statute of

limitations under [28 U.S.C.] Section 2255(f) and any

-4-

procedural-default defense in order to permit the resolution of legal claims arising from the erroneous presentation of microscopic hair examination...testimony."

Verdugo and Matta-Ballesteros, have begun litigation on this matter, and are being represented by legal counsel, Mr. Todd W. Burns, and by agreement with government counsel, Timothy Searight, those applications were filed as "unopposed." Vasquez is not being currently represented by legal counsel. Verdugo's and Matta-Ballesteros's §2255 petitions alleges the same issue as that of Vasquez. Because there is no fair reason for the government to take conflicting position with respect to the three cases, this application is written with the expectation that the government will (1) not oppose it, and (2) waive any procedural defenses to Vasquez's new §2255(a) motion. Rather than wait, it seemed prudent to move forward with Vasquez's motion to "vacate, set aside, or correct [his] sentence." 28 U.S.C. §2255(a).

Below, Vasquez first sets out the relevant background, then turns to his claim for relief and his request that the Court compel discovery.

RELEVANT BACKGROUND

A. Introduction

The background discussion below proceeds with summaries of: (1) the government's trial evidence; (2) problems in the FBI lab (with a focus on Agent Malone), as recounted in the 2014 OIG Report; and (3) DOJ Special Counsel Norman Wong's October 17, 2014 letter to Verdugo's trial counsel, notifying him that Malone's hair testimony in Verdugo's trial, which

was essentially the same as in Vasquez's trial, was invalid.

B. The Government's Trial Evidence

   1. Introduction

   The government's trial theory was that leaders of a drug
cartel based in Guadalajara were behind the kidnapping and
murder of Agent Camarena, because they blamed Camarena for
several large busts in 1984 and 1985, and they wanted him
interrogated to find out what he knew about the group's
operations. See e.g., 7/11/90 RT at 83-101, 141. The
government's evidence at the trial concentrated almost
entirely on the Camarena abduction/murder. Of the dozens of
witnesses called in the government's case-in-chief, only two
witnesses (other than the case agent) were called in
connection with the Walker/Radelat murders attributed to
Vasquez. One witness was Enrique Placencia-Aguilar
("Placencia"), who purported to be a percipient witness to
certain events immediately prior to the murders at the La
Langosta restaurant. Placencia testified at trial that he was
standing outside in the parking lot of the restaurant and
overheard some commotion from inside; he looked through the
keyhole of the front door (or crack in the door) and observed
Vasquez in a group of men who were forcibly taking an
individual towards the rear of the restaurant. This evidence
alone did not establish murder, however, because Placencia
did not testify that he observed anyone being murdered, or
that Vasquez was involved in any murders at the La Langosta
restaurant; in fact, he did not testify at all about any
killings.

   The government's attempt trial evidence that purported to

-6-

connect Vasquez to the La Langosta murders came through a
second witness: Hector Cervantes-Santos ("Cervantes").
Cervantes claimed to have seen Vasquez as a bodyguard on
occasions when the drug traffickers who plotted the
kidnapping of agent Camarena gathered together (i.e.,
Cervantes' testimony purported to place Vasquez within the
alleged drug cartel which was the "racketeering enterprise"
under 18 USC §1959). Cervantes also testified that shortly
after the La Langosta murders, Vasquez telephoned the
residence known as "La Quinta", where Cervantes allegedly
worked as a housekeeper, and made statements over the phone
about stabbing "two gringos" at the restaurant with icepicks.
Beyond giving testimony that purported to directly implicate
Vasquez in the La Langosta murders, Cervantes served to
bolster the dubious credibility of Placencia.
See United States v. Vasquez-Velasco, 15 F.3d 833, 838 (9th
Cir. 1994). As far as evidence that Vasquez was involved with
the highly publicized kidnapping and murder of Drug
Enforcement Agent Enrique Camarena and his civilian
assistant, as a bodyguard when the drug traffickers who
plotted the kidnapping gathered together and the
Walker/Radelat murders at La Langosta restaurant, the
government relied on just three things: (1) the since
discredited testimony of Agent Malone; (2) the repeatedly
discredited testimony of Hector-Cervantes-Santos; and (3) the
dubious credibility of Enrique Placencia-Aguilar. The trial
testimony of Malone and Cervantes is summarized below.

    2. Testimony of Agent Malone

        a. Evidence Collected

Malone testified that on April 12, 1985, he and three other FBI agents went to collect forensic evidence at 881 Lope de Vega, a large residential compound in Guadalajara that included a main house, an "outbuilding," a pool, a spa, and a tennis court. See 6/29/90 RT at 34-35, 38, 40, 46-47. Malone said that the agents went there because "[w]e were advised that a residence had been located that both the [Mexican Federal Judicial Police] and DEA believed was used to hold, interrogate and eventually murder Special Agent Camarena." Id. at 35. When the agents arrived at the residence on the evening of April 12, there was a "squad" of Mexican police officers "actually living" there, and a Mexican forensics team was "removing obvious items of evidence." Id. at 37.

The agents first walked the property to look for a place that someone might have been held hostage. See id. at 37. They concluded the most likely place for that was a room with an attached bathroom, which was part of an "outbuilding" that also included a room with pool equipment, quarters for the property's caretaker, and a storage room. See id. at 40, 49. Agents dubbed the room with the attached bathroom the "guest house," and they focused on it because it had a steel door and one small window. See id. at 40-42. Malone divided the carpet in the guest house into four quadrants, vacuumed up the contents, and packaged them for later analysis. See id. at 52-53, 91. Malone also took carpet samples from the guest house and carpets in the main residence. See id. at 55. The agents then left the property with plans to return the next day. See id. at 79.

When he returned the next morning, Malone focused his attention on an upstairs bedroom in the main house, because he thought that was the second most likely place a person might have been held hostage. See id. at 42-43, 81. That room was locked on April 12, but was opened by Mexican officials the next morning. See id. at 42, 81. Malone took sheets off the bed in that room, divided the carpet into two quadrants, vacuumed, and packaged the contents for later analysis. See id. at 82-82, 91.

Next Malone vacuumed a Volkswagen Atlantic car that was parked in a carport at the residence, and packaged the contents for later analysis. See id. at 50, 83, 87, 91.

After that, the agents took a break for lunch and walked the property again. See id. at 87. When they discovered a bent license plate in a drain by the tennis court, tension developed with the Mexican authorities present and the agents were told to leave the property, ending the gathering of evidence there. See id. at 88-90.

In addition, to the things collected on April 12-13, 1985, Malone said he received the following items for analysis.

First, FBI Agent Rawalt sent him vacuum sweepings from the bathroom next to one of the bedrooms in the main house at Lope de Vega. See id. at 92.

Second, FBI Agent Oakes sent him a car floor mat and vacuum sweepings taken from a Mercury Grand Marquis that the government believed was involved in the abduction of Agent Camarena. See id. at 93.

Third, on November 25, 1985, Malone went back to

-9-

Guadalajara and met with Mexican law enforcement officials, who gave him: (1) a sample of fabric that smelled of a decomposing body, and which looped like a pillow case that he took from the upstairs bedroom at Lope de Vega; (2) a second piece of fabric that also looked like a pillow case that he took from Lope de Vega; (3) a stained piece of rope that smelled of a decomposing body; and (4) a clean piece of rope. See id. at 95-102.

Fourth, he received an FBI package that contained a piece of adhesive tape with many hairs stuck to it, which the government characterized as a blind fold. See id. at 104.

Fifth, he obtained hair samples  from three of Vasquez's co-defendants,  Matta, Sergio Espino-Verdin and Rene Verdugo-Urquidez. See id. at 103, 110.

b. Malone's Opinions

After discussing the items he gathered for analysis, Malone gave his expert opinions. The bulk of his testimony focused on hair comparison. Malone began by explaining that his hair analysis involved using three different types of microscopes to compare hairs taken from a known person ('known hair"). See id. at 114. Using this process, Malone said, he could determine if an unknown hair: (1) was forcibly removed, cut off, or shed; (2) came from a human, and if so the human's race; and (3) was bleached or showed signs of disease. See id.  at 115-17. Malone also claimed that if he could isolate fifteen characteristics on the unknown hair, he could determine if it matched a known hair. See id. at 119. He said that he looked at those characteristics and "how they're arranged within that hair, because everybody's hair

-10-

are arranged slightly differently, almost everybody's." See id. at 120. He implied that based on his experience of examining hairs from over 10,000 people, the chance of a false match was less than 1 in 5,000. See id. Later, during cross examination, Malone indicated that the chance of a false match was one in "several thousand," and he stated, "If I match a hair to a particular individual, I consider the chances of that hair coming from somebody else other than that individual to be highly unlikely." 6/20/90 RT at 79-80.

Malone then turned to the hair evidence that he examined related to this case, and gave the following opinions.

1. A hair that he found in the guest house "matched" Agent Camarena, and had been forcibly removed. See id. at 125-26, 130.

2. Two hairs that he found in the Volkswagen Atlantic "matched" Agent Camarena, and had been forcibly removed. See id. at 128-30.

3. A hair that he found in what he labeled bedroom four of the main residence at Lope de Vega "matched" Agent Camarena, and had been forcibly removed. See id. at 130-31.

4. A hair that he found in the guest house "was absolutely indistinguishable" from Matta's hairs, and was not forcibly removed. See id. at 207-08, 210. Malone said that the hair was found in the same quadrant of the guest house where he found Agent Camarena's hair.

5. A hair found in the bathroom adjacent to bedroom four "matched" Matta's hairs. See id. at 208-09.

6. A hair that he found in the guest house "perfectly matched the hairs of Mr. Espino Verdin in all

-11-

characteristics," and had not been forcibly removed. See id.
at 205-06. The government alleged that Espino, a former
commandante in the Mexican Federal Judicial Police, was the
"primary interrogator" of Agent Camarena when he was held
hostage. See e.g., 7/11/90 RT at 120-22.

7. A hair that he found in the guest house "was
absolutely indistinguishable from the head hairs of Rene
Verdugo," and was not forcibly removed. See id. at 206-07.
The government introduced evidence that George Espana Gomez
saw Verdugo in the main residence at 881 Lope de Vega on
February 8, 1985, and the government argued that Espana's
observation that Verdugo looked tired was evidence that
Verdugo was involved with interrogating Camarena. See e.g.,
7/11/90 RT 118-20.

8. A hair that he found on the floor mat of the Mercury
Marquis "matched those of Agent Camarena." Id. at 122-24.

9. A sample of a sheet and tape taken off of Camarena's
body after he was found had hairs on them that matched
Camarena. See id. at 131-33. Presumably this evidence was
meant to confirm that the badly decomposed body found was
Agent Camarena's, thought there were other sources of
evidence for that identification.

To boost the weight of his hair testimony, Malone said
that all of his "matches" were based on twenty
characteristics, rather that the fifteen normally required to
make a match. See id. at 124, 126, 131, 206, 207, 209.

Malone also testified about fiber evidence, though he did
not make the strong claims about fiber evidence that he made
with respect to hair evidence. Instead, he said that by

-12-

examining an unknown fiber under a microscope he could
determine whether it was "consistent with coming from [a]
particular source, such as a carpet." See 6/19/90 RT at 137.
Without some context or explanation, this testimony was of
little or no value. That is probably why the government
hardly mentioned the fiber testimony during  its closing
argument. Malone did, however, seem to suggest one context in
which his fiber analysis might have some statistical punch if
he found a match. Specifically, he said that if he found a
carpet fiber that had "a high enough concentration of dye
that we can analyze it," he could use a "specially
constructed machine" called a "microspectrophotometer" to get
a "spectral fingerprint" of the fiber and determine who
manufactured the carper. See id. at 136-37, 147, 226.

    Malone then turned to the fiber evidence that he examined
related to  this case, and gave the following opinions.

    1. Two fibers were found on the tape that the government
believed was used to blindfold Agent Camarena. See id. at 145-
46. One fiber could have matched the carpets in bedrooms
labeled one, two, and four at Lope de Vega. See id. at 146.
For the second fiber, Malone claimed that he relied on the
microspectrophotometer to conclude that it "had the same dye
and came from the same manufacturer" as the carpet found in
what was labeled bedroom number three. See id. at 146-47. But
even with that, the most Malone could say was that the
unknown second fiber was "consistent with coming from bedroom
 three." Id. at 146.

    2. A fiber that he found on a sample of sheet provided by
the Mexican authorities "could have matched" the carpets in

-13-

bedrooms labeled one, two, and four at Lope de Vega. See id.
at 142.

3. A fiber that he found on a sweatshirt taken from the
body of Alfredo Zavala "could have originated from" the
carpet in the guest house, the living room, or the dinning
room at Lope de Vega. See id at 140. As mentioned above,
Zavala was a pilot and informant who worked with Agent
Camarena and whose body was found with Agent's Camarena's in
a field in Mexico on March 5, 1985. See 7/11/90 RT at 70.

4. Samples of fabric that he received from FBI Agent
Dillon and the Mexican authorities "were consistent"  with
sheets that Malone took from Lope de Vega. See id. at 150-52.

5. A piece of tape taken from Agent Camarena's body
during his autopsy matched a piece of tape provided by the
Mexican authorities. See id. at 158. It is hard to know why
this evidence is relevant, because presumably the Mexican
authorities took the tape from  Camarena's body.

6. A piece of rope that Malone received from the Mexican
authorities was similar to a piece of rope taken from
Camarena's body during his autopsy. See id. at 157.
Considering that there was no evidence about where the first
piece of rope was found, this evidence carried no weight.

While Malone did not explain what, if any, weight the
jury should attach to the fiber evidence, whatever value  it
might have had was  seriously compromised by the fact that
almost all of it came from unidentified Mexican law
enforcement officials. Those officials may well have tampered
with, or planted, fiber (and hair) evidence.  That is not
wild speculation. The  government in this case: (1)

-14-

repeatedly claimed that officials at all levels of the Mexican government, including law enforcement and the military, were corrupt; (2) said that Mexican officials involved in investigating the Camarena murder had been paid off by drug traffickers and had engaged in an "incredible history of, quite frankly, not insignificant obstruction [beginning] shortly after the loss of Camarena;" (3) emphasized that a "Mexican technician" was seen "scurrying out of [881 Lope de Vega] with evidence" shortly before FBI agents arrived; and (4) claimed that the alleged crime scene was "contaminated" by the Mexican Federal Judicial Police. See 7/11/90 RT at 57, 59; 7/13/90 RT at 10, 36, 59, 67; see also 6/20/90 RT at 35, 94.

Malone wrapped up his testimony by providing the jury a diagram of the Lope de Vega compound, with photographs and charts, that powerfully summarized his testimony with respect to Agent Camarena and Zavala. See 6/19/90 RT at 135, 149, 201, 215. It is worth noting that Malone's testimony had a synergistic effect with his statement, at the outset, that agents had gone to the property based on a tip. See id. at 35. The content of the tip was unexplained, and the claim that there was a "tip" was hearsay. But Malone's hair testimony gave substance to the hearsay "tip," and corroborated it. That is, with Malone's testimony: (1) the jury was effectively told that the "tip" was that Agent Camarena was held at the Lope de Vega compound; and (2) the forensic evidence corroborated the accuracy of the "tip." Given what is now known about Malone, and is discussed below, it would be easy to conclude that he cooked up his testimony

-15-

to elevate the vague hearsay "tip" to unassailable fact. The
government's case needed that help, because it was otherwise
based entirely on the testimony of Hector Cervantes. That
testimony is discussed next.

   3. Testimony of Hector Cervantes-Santos

      a. Introduction

 The government asserted that the development of the
conspiracy to kidnap Agent Camarena was evidenced by five
meetings, the first of which was in September 1984, and the
last of which was days before Camarena's abduction on
February 7, 1985. Cervantes-Santos claimed he was present at
those meetings. Two of those meetings were held on the same
day in October 1984, at La Quinta, the home of Javier Barba
Hernandez. Barba was a Mexican attorney and was believed to
be a liaison between Guadalajara-based drug traffickers and
high ranking Mexican government officials. Cervantes claimed
that from 1982-85, he was the head of security at La Quinta.
See 5/23/90 RT at 172; 5/24/90 RT at 4.

 Through his work at La Quinta, Cervantes knew several
members of the Vasquez-Velasco family, including the four
brothers - Javier (Vasquez), Eliseo, Ricardo and Antonio -
and Antonio's son, Antonio Vasquez-Ochoa ("Ochoa"). See
5/23/90 RT at 180; 5/24/90 at 26. Cervantes made an in-court
identification of Vasquez. See 5/23/90 RT at 181, 182.

 Cervantes testified that in approximately September 1984,
a baptism was held at La Quinta for Barba's child. The
Vasquez-Velasco brothers, including Javier (Vasquez), served
as bodyguards and were armed with guns. After the party
concluded, Vasquez stayed at the house. See 5/23/90 RT at

-16-

175, 180, 182, 187. The day after the party, Barba went with Vasquez to Ocotlan, Mexico. See id. at 187, 188.

Cervantes testified that in approximately September 1984, codefendant Zuno arrived at La Quinta for a meeting with Barba. At the meeting, Cervantes observed Zuno give five DFS (Mexican police) credentials to Barba, which included the photograph of Vasquez on one of those credentials. See 5/24/90 RT at 6, 8, 9.

On a second occasion, five or six days after the first meeting, Cervantes again observed Zuno arrive at La Quinta and give Barba credentials. On that occasion, Vasquez and his brother were already present at La Quinta when Zuno arrived. See 5/24/90 RT at 9, 11.

Cervantes testified that at a wedding held at La Quinta, the bodyguards included Vasquez and his brothers. At the conclusion of the wedding, certain named individuals left La Quinta for the Guadalajara Airport, including Vasquez. See 5/24/90 RT at 25, 26, 28.

Cervantes testified that he was familiar with the restaurant La Langosta because Barba would eat there on occasions without paying. In January 1985, on the date of the La Langosta murders, Barba was at La Quinta with Vasquez and his brothers and Ochoa. Rafael Caro-Quintero calls the house, speaks to Cervantes and tells him to tell Barba that he (Caro) is waiting for Barba at La Langosta. Barba then leaves the house for the restaurant in the company of Vasquez and his brothers. Cervantes stays behind at the house. See 5/24/90 RT at 28-29, 31. Late that same night, Barba and Ochoa returned to La Quinta with blood on their clothes,

-17-

shoes and guns. See id. at 31-33. Ochoa states to Cervantes that "some damn Gringos - they had caught them spying, and that they had  beaten the shit out of them." See id. at 35.

Cervantes cleaned the blood from Barba's gun and from the Gray Marquis sedan in which Barba and Ochoa had driven back to La Quinta from the restaurant. Two days after the La Langosta murders, Vasquez arrives at La Quinta and tells Cervantes that "he's going to let (Barba) know that both Americans had died." Vasquez  tells Cervantes that "they had been stabbed with ice picks." See 5/24/90 RT at 34, 35, 37, 38.

Shortly after the murder of DEA agent Camarena in February 1985, Zuno arrived at La Quinta and met with Barba. Zuno states that because of "trouble" resulting from Camarena's murder, he needs 25 people to go to an area in Jalisco, Mexico, to dig up five tons of marijuana. Barba tells Vasquez and his brother, Eliseo, to organize the people for this task. Shortly thereafter, Vasquez and Eliseo return to La Quinta with a large truck carrying 25 people. See 5/24/90 RT at 39, 45, 46-48. Barba subsequently told Cervantes that the marijuana problem had been resolved and that there would be no more problems in that regard. See id. at 50.

Barba tells Cervantes that the "trouble" resulting from Camarena's death "had gotten a little worse" and that he was going into hiding; that Cervantes should stay behind at La Quinta. Id.

Thereafter, Cervantes received a phone call at La Quinta from Vasquez, who identified himself by the family  nickname,

-18-

"Tierre Libre", and said to Cervantes that he needed to tell
Barba "about something that had happened", namely, "that
Pavon [Armando Pavon-Reyes] had killed everybody in the Bravo
family"; that "the bodies were there at La Primavera, and
that they would have to be moved because it belonged to Don
Ruben and that Don Ruben would be in trouble." Cervantes
conveys this message to Barba, who picks up the phone in
Cervantes' presence, calls Vasquez, and tells him, "what had
been done was bad, that they should take the bodies away
from there." See 5/24/90 RT at 50-51, 52-53.

During his closing argument the prosecutor stated that
Vasquez was one of the bodyguards at La Quinta who "protected
the leaders. And, in fact, they also protected the corrupt
officials." That Vasquez was a bodyguard at the key events.
See 7/11/90 RT at 59, 107-08, 127-28. That, shortly
thereafter, Barba decides to leave La Quinta, he speaks on
the phone to Vasquez in the presence of Cervantes "and tells
him, 'Well, what's done is done, and you ought to move the
bodies, do something with them.'" This is significant, and
let me tell you why. "You know that the bodies of Camarena
and Zavala were dumped at the Bravo ranch 70 miles southeast
of Guadalajara. They were not buried there originally because
the soil did not match. (Vasquez) tells you what happened in
that telephone call." See 7/11/90 RT at 116-17.

However, below is a discussion of how his testimony was
bought.

b. The Buying of Cervantes's Testimony

In late 1989, as Vasquez's trial neared, DEA agents
scrambled to find a witness who would add something to

Malone's forensic opinions. That is when they were put in touch with Cervantes by a Mexican law enforcement officer, Antonio Garate Bustamante. See 5/24/90 RT at 79. Cervantes had been a Mexican police officer, and Garate was his boss. See id. By late 1989, however, Cervantes was working as a security guard at a hotel in Guadalajara and earning $45 a month. See id. at 85. Cervantes was looking to improve his circumstances, and before Garate put him in touch with DEA Agent Hector Berrellez, Cervantes and Garate discussed what he could gain from the introduction. See id. at 84-86.

When Cervantes first went to speak with Agent Berrellez, he was well aware that the DEA wanted evidence to support their theories about who was responsible for Agent Camarena's abduction and murder. But Cervantes did not go with noble intentions - he went to help himself. Thus he began by stating that he would not help the agents unless he and his family were given permanent residence in the United States. See id. at 90. He also demanded money. At his first meeting with DEA agents, on November 23, 1989, he was given $2,000 cash. See 5/25/90 RT at 12. On November 30, he testified in front of the grand jury, after which he was paid $1,500 cash. See 5/29/90 RT at 65. He was soon promised a "salary" of $3,000 per month, though he received much more: (1) $7,000 on December 18, 1989; (2) $9,000 on January 1 and 4, 1990; (3) $7,500 in February 1990; (4) $4,000 in March 1990; and (5) $7,000 in April 1990. See 5/29/90 RT at 30-31; 6/29/90 RT at 170-71. The more Cervantes was paid, the more he was able to "remember." And to ensure that Cervantes kept remembering, the DEA agents made clear that they could cut

-20-

off the flow of money, and his and his family's residency in
the United States, at any time. See 5/24/90 RT at 127-29.

c. Inconsistencies In Cervantes's Testimony

Cervantes's testimony about what happened in the
Walker/Radelat and Camarena/Zavala killings was riddled with
inconsistencies. Indeed, during his closing argument the
prosecutor said that he would forgo discussing the
inconsistencies, "because [otherwise] I'd be here far too
long, more than you could stand ." See 7/13/90 RT at 39, 42.

The purchase of Cervantes's testimony is enough to render
it suspect. Coupled with its inconsistencies, the testimony
is worthless. However, here are some examples of Cervantes's
inconsistencies.

As mentioned above, the government presented evidence
with respect to five alleged meetings that evidenced the
development of the conspiracy to kidnap Agent Camarena: (1) a
September 1984 meeting at Javier Barba's home, La Quinta,
held on the day that Barba's son was baptized; (2) two
meetings at La Quinta, held on the same day in October 1984,
before and after the wedding of Jorge Barba (Javier's
brother); (3) a December 1984 meeting at La Bajadita, a home
owned by Ernesto Fonseca; and (4) a February 1984 meeting at
La Quinta shortly before the kidnapping of Agent Camarena.
See 5/23/90 RT at 121-125; 5/24/90 RT at 17, 20, 92, 109.
Cervantes provided all of the government's testimony about
four of those meetings. As for the other - the December 1984
meeting which was the fourth in the series chronologically -
the government relied solely on the testimony of Placencia
Aguilar. Notably, it was not until the December 1984 meeting

-21-

that Agent Camarena was allegedly identified, and it was not the February 1985 meeting that there was allegedly an agreement to kidnap him. See 5/23/90 RT at 133.

Cervantes first met with DEA agents in Los Angeles on November 23 1989. Though the agents told Cervantes from the outset that he should tell them anything he knew about Agent Camarena's abduction, he did not mention any October 1984 meeting at that time. See 5/24/90 RT at 60, 93-94; 6/29/90 RT at 140. He also did not mention those meetings on November 30, 1989, when he  met with the lead prosecutor and DEA Agent Berrellez. See id. at 94. Later that day, Cervantes testified to the grand jury. Again, he did not mention any October 1984 meetings. See id. at 10;; 5/29/90 RT at 87. It was not until January 2, 1990 that Cervantes first made claims about the October 1984 meetings. See 5/24/90 RT at 94.

Those claims were, however, far from consistent. For example, with  respect to the post-wedding meeting, Cervantes claimed it was attended by "Ruben Zuno Arce, Javier Garcia Paniagua, his brother, Marcelino, Miguel Aldana, Manuel Ibarra, Matta a person that I knew as cochiloco, Armando Pavon Reyes, Rafael Caro Quintero, Ernesto Fonseca Carillo." See 5/24/90 RT at 26-27. Cervantes testified that Zuno "said that [the unidentified DEA agent] should be picked up once they knew who he was," but Paniagua had a different idea, saying that it would be good "to  identify that person to see if he would cooperate with them...." Id. at 28. Cervantes indicated that there was no discussion of what should be done if the agent would not cooperate. See id.

It is noteworthy that even if one were to believe

-22-

Cervantes's testimony, it did not establish that, at the time of the October 1984 meetings, there was a conspiracy to kidnap Agent Camarena. See e.g., United States v. Melchor-Lopez, 627 F.2d 886, 889-90 (9th Cir. 1980)(holding that there was insufficient evidence of a conspiracy because, "[d]espite lengthy discussions, the men at this meeting never agreed to a definite plan....[There was no] evidence of a mutual understanding to accomplish a specific objective or of an intention to be bound by any agreement"). Any such conspiracy was not formed until much later, and arguably not until the claimed February 1985 meeting. Specifically, during his grand jury testimony Cervantes said that at the February 1985 meeting, Zuno and Barba suggested kidnapping Agent Camarena, but during his trial testimony Cervantes said that Caro made that suggestion. See 5/24/90 RT at 115-19. When Cervantes was confronted with this inconsistency at trial, he said that the court reporter for the grand jury proceedings must have erred. See id.

That seems unlikely, and it does not explain away all of the other problems with Cervantes's testimony. It is impossible to adequately cover all of those problems here, but a brief mention of some other examples is telling: (1) in his initial statements, and during his grand jury testimony, Cervantes said only that there was a baptism at La Quinta in September 1984m but by trial that had evolved into the first of his four claimed meetings, see 5/24/90 RT at 111; 5/29/90 RT at 22-23, 52; (2) during his grand jury testimony, Cervantes said there had been another important meeting, a week before the October 1984 wedding, but at trial he

abandoned that claim, see 5/29/90 RT at 85-87; (3) Cervantes
lied about the phone call he alleged he received at La Quinta
from Vasquez, who he says, identified himself by the family
nickname, "Tierre Libre", and said to him that he needed to
tell Barba "about something that had happened", namely, "that
Pavon [Armando Pavon-Reyes] had killed everybody in the Bravo
family"; that "the bodies were there at La Primavera, and
that they would have to be moved because it belonged to Don
Ruben and that Don Ruben would be in trouble." He conveys
this message to Barba, who picks up the phone in his
presence, calls Vasquez, and tells him, "what had been done
was bad, that they should take the bodies away from there."
This phone call was never made because, there was conclusive
evidence through public records from Mexico and defense
witnesses that no telephone service existed in the area where
La Quinta was located until approximately 1989 - years after
the La Langosta and Camarena murders, see 5/24/90 RT at 50-
51, 52-53; (4) Cervantes also lied about how much the
government paid him for his testimony, see 5/24/90 RT at 107-
08; (5) Cervantes claimed, falsely, that he was not on the
payroll of drug traffickers when he was a Mexican police
officer, see 5/24/90 RT at 67-71; (6) Cervantes gave
conflicting statements about whether he was an  armed
bodyguard for one of those men, Javier Barba, see 5/24/90 RT
at 71-72;  and (7) Cervantes lied about being shown
photographs of the defendants to prime him for his in-trial
identification of them, but he was later forced too admit
that he had  been shown photographs of them, with there names
affixed to it, in the federal building in late 1989, and

-24-

shortly before he testified. See  5/25/90 RT at 101-02;
5/30/90 RT at 255; 5/29/90 RT at 11-13.

There is little wonder that during his closing argument
the prosecutor declined to address the inconsistencies in
Cervantes's testimony - it would have driven home the
incredibility of that testimony. The prosecutor dodged this
problem by putting great weight on the expert hair testimony
of Agent Malone, and then using that testimony to bolster
Cervantes's dubious testimony. That effort is discussed next.

5. The Government's Closing Argument

The government's closing argument against Vasquez, based
on the testimony of Cervantes, amply demonstrate that the
prosecutor relied heavily on the testimony of Cervantes on
its case against Vasquez, to: connect Vasquez to the
racketeering enterprise and to the La Langosta murders; to
establish for the jury why the two individuals were killed at
La Langosta, and to suggest that the motives in killing them
were linked to the subsequent motives a week later in
abducting/killing agent Camarena and Alfredo Zavala; and to
establish a link between the La Langosta killings and the
Camarena/Zavala killings through testimony about Vasquez's
suggestions that the bodies be moved from Primavera Park. The
government argued that Vasquez's phone call to Barba in which
he suggests that the bodies be moved, explains the forensic
evidence at trial which established that soil samples taken
from Camarena/Zavala did not  match - proof, in the
government's  eyes, that the corpse of these victims has
indeed been relocated from one  burial spot to another.
Through Cervantes' testimony against Vasquez, the government

-25-

sought to add a critical logical thread in its forensic analysis as to the Camarena/Zavala killings.

After summarizing the "good" parts of Cervantes's testimony during closing, the prosecutor claimed that the testimony was "corroborated" by Agent Malone's forensic testimony. See 7/11/90 RT at 117-18, 122. The prosecutor then lauded Malone before turning to the hair evidence related to Agent Camarena:

> [Agent Malone] went on at great length - and I won't repeat it - but he has incredible training, has examined thousands and thousands of hairs. He takes final exams, and every time he passes exams with flying colors. He has taught, he has published. This man knows his stuff. That is unequivocal. And his conclusion to you after perhaps a full day of testimony was that Camarena was at the Lope de Vega house and particularly in the guest house. And Camarena had hair forcibly removed from him in the guest house.

7/11/90 RT at 123. Next the prosecutor recounted Malone's testimony in detail, then re-emphasized the hair evidence with respect to Agent Camarena and Vasquez's codefendant's:

> Hair: Mr. Malone tod you that head hair from Camarena matched head hair found in the Mercury. Head hair from Camarena matched hairs found in the VW Atlantic. Head hair from Camarena matched hair found in the guest house, and hair from Camarena matched hair found of Camarena in bedroom number 4.

> Keep this in mind. The hair of Camarena that was found in the VW, the guest house, and bedroom number 4, had been forcibly removed according to Special Agent Malone.

> And of course, in addition to Camarena's hair, Special Agent Malone found hairs in the guest house that were similar to hairs from the head of Matta Ballesteros, Verdugo and Espino Verdin. Special Agent Malone found hairs in bedroom number 4 that matched hairs from Matta, as well.

7/11/90 RT at 126.

The prosecutor started by mentioning Cervantes's testimony, but he acknowledged that Cervantes's testimony did not establish that Vasquez and his codefendant's entered into a conspiracy to kidnap Agent Camarena. Specifically, the

prosecutor said that at the October 1984 meetings, the
"members of this enterprise, the leaders, particularly, are
trying to formulate a strategy and plan as to how to deal
with this agent, whoever that may be, who's causing all these
problems." 7/11/90 RT at 109.

Thereafter, the prosecutor again bolstered the
credibility of Cervantes's testimony by relying on Malone's
testimony, telling jurors, "you know that everything that
Cervantes" testified to "is true" because "the hair for these
rooms, particularly the guest house, the torture chamber,
matches hair coming from...[Vasquez's codefendant's]." Id. at
145.

In its rebuttal closing argument, the government again
emphasized the hair evidence and how that evidence
"corroborated" Cervantes's testimony. The prosecutor began by
stating:

> Two hairs found at Lope de Vega match the hair from the head
> of Matta Ballesteros. Here is the reason why: Mr. Malone has
> been around the block. You either accept his testimony or
> you don't. He knows what he's doing. He's doing - he's an
> expert in this area. I submit to you you should believe him.

> Why are these hairs from Matta? For several reasons. 20
> characteristics were matched up, not one or two; 20. And that
> includes subclasses of characteristics.

> Second, he told me about the hair relating to Matta found in
> the guest house. He said it was absolutely indistinguishable,
> there were no dissimilarities, and that this was the kicker:
> unique racial characteristics of Mongoloid and Negroid,
> something he had seen only twice in about 15 years.

> I submit to you: that is hair that comes from the head of
> Matta. I mean, look at his experience. He's reviewed thousands
> of thousands of Hispanic hairs.

7/13/90 RT at 56-57. The prosecutor then said that to
believe...[Vasquez's codefendant] was innocent, the jury
would have to come to the absurd conclusion that there was a

-27-

"grand conspiracy" amongst government agents. The prosecutor

again and again bolstered Cervantes's testimony by relying on

Malone's testimony:

> You're going to believe that someone grabbed two of Matta's
> hair, they go up to the Lope de Vega house, climb up the stairs
> to the upstairs bedroom, and plant one in the bathroom of that
> bedroom, no. 4. Then they go downstairs. They go outside to the
> back where the guest house is, and they go in the guest house
> and they plant the second hair of Matta.
>
> I see some grins here, but the point is, you see how ludicrous
> it is. That hair is there because it came from Matta. That hair
> came from Matta because Matta was there.
>
> And furthermore, you know that the hair at Lope de Vega was not
> there one or two years. You know that because starting from
> January 1985 on, that place had been refurnished, repainted and
> recarpeted. It had been sanitized. So anything found after
> January had to be put there by people who were there after
> January. And after January, Camarena was abducted and tortured
> in the guest house, and Matta was there, ladies and gentlemen.
>
> That's the explanation. **And this corroborates Cervantes when he
> tells you these meetings occurred. This troubles [defense counsel]
> when I make that argument to you, but that's one of the strongest
> argument in this case.**

7/13/90 RT at 58. (emphasis added). Thus, the jury did not

have to worry about Cervantes's lack of credibility, because

his testimony was backed up by Malone's. The bitter irony of

the prosecutor's argument is that the grand conspiracy

concocted by the prosecutor was not required - Malone could

handle the job himself.

Finally, the prosecutor explained  to the jury why there

was no other forensic evidence, such as fingerprints, to

support Vasquez codefendant's presence at Lope de Vega.

Specifically, the prosecutor said that it is easy to avoid

leaving, or to clean up, fingerprints, but hair is different:

> But hair? You have no control over that. Malone told you that.
> You know, you're going to lose hair out of your head on a daily
> basis, come hell or high water, and you have no control over that.

-28

And that's Matta's hair there, because Matta was there, I would submit to you.

7/13/90 RT at  59.

As for the fiber evidence, the prosecutor had very little to say. See 7/11/90 RT at 125. Perhaps that was because the critical fiber evidence came from Mexican officials, and could have been easily tampered with by those corrupt officials. Or maybe the prosecutor did not say much about the fiber evidence because Malone acknowledged that the fiber evidence only allowed him to say that fibers he found on items provided by Mexican authorities "could have matched" carpets in Lope de Vega. See e.g., 6/19/90 RT at 142. Or maybe that evidence received short treatment because none of it incriminated the defendant's. Whatever the reason, the fiber evidence played little part in the government's case.

Vasquez now turns to the July 2014 report from the DOJ's Office of Inspector General, which discusses Malone's penchant for providing false testimony.

C. Office of General's July 2014 Report

In July 2014, the Department of Justice's Office of Inspector General (OIG) issued An Assessment of the 1996 Department of Justice Task Force Review of the FBI Laboratory (2014 OIG Report). (As stated on its website, https://oig.justice.gov/about/, "The Office of the Inspector General (OIG) in the U.S. Department of Justice (DOJ) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in DOJ programs and personnel, and to promote economy and efficiency in those programs. The OIG  investigates alleged violations of criminal and civil laws by DOJ employees and also audits

and inspects DOJ programs.")   Key aspects of that Report are
summarized below.

"The OIG first investigated the FBI Lab in 1994 when
Frederic Whitehurst, an FBI Supervisory Special Agent and
Ph.D. scientist who worked in the Lab between 1986 and 1998,
complained to the OIG and the Department's Criminal Division
about irregularities at the FBI Lab." Id. at 2. In January
1996, two years after the OIG began its investigation of the
FBI lab but prior to the release of its related 1997 report,
the DOJ's Criminal Division created a separate Task Force to
manage "the identification, review, and follow-up of cases
involving the use of unreliable analysis and overstated
testimony by FBI Lab examiners in  criminal cases." Id. at 1,
4. The purpose of the Task Force was to determine if problems
in the FBI lab "gave rise to any constitutionally required
disclosure in specific prosecuted cases," and to inform
prosecutors "so they could make disclosures if appropriate,"
Id. at 4.

"In June 1997, 6 weeks after the OIG released its [1997]
report, the [DOJ] Task Force determined that the work of 13
FBI Lab examiners...addressed in the OIG['s 1997] Report
warranted closer scrutiny. Accordingly, the Task Force
narrowed its scope from a broad review of all Whitehurst
allegations to those cases involving only the 13 FBI
examiners [that the Task Force] determined had been
criticized by the OIG (13 criticized examiners)." Id. at 4.
Though its focus was narrowed, the  Task Force's mission
remained the same: to identify cases in which faulty lab work
or testimony was used to obtain a conviction, and to ensure

-30-

that defendant's in such case were notified. See id. The Task
Force ceased operating in July 2004, though subsequent
events showed that it came up far short of completing its
mission. See id. at 5.

 That became clear "[i]n April 2012, [when] the media
reporting concerning tainted convictions of several criminal
defendants whose convictions relied upon forensic evidence
analyzed by the FBI Lab drew public and congressional
interest." See id. This included reporting on four cases in
which defendants whose convictions were "based in part on FBI
hair analysis and testimony" were later exonerated, but only
after three had spent several years in prison, and the
fourth was executed. Id. Two of those cases were never
reviewed by the DOJ Task Force, because of arbitrary
limitations on the scope of its review. See id. The other
two were reviewed by the Task Force, and that review revealed
"deficiencies in the Lab analysis or testimony in both cases.
However, in [one case] the prosecutor failed to convey the
identification of deficiencies to the defendant or defense
counsel. In [the other case], the identification of
deficiencies came too late to be of value to the defendant,
who was executed 4 days after issuance of the 1997 OIG
Report." Id. at 5.

 These revelations led to a new OIG investigation (and its
2014 Report), which focused on the DOJ Task Force's
"identification, review, and follow-up cases involving the
use of scientifically unsupportable analysis and overstated
testimony by FBI Lab examiners in criminal prosecutions." Id.
at i,6. The  OIG's new investigation "found critical

-31-

deficiencies in the [Task Force's] case review process and implementation," and in its 2014 Report the OIG made recommendations designed "to meet the Task Force's [originally stated] objectives." Id. at 1.

The Task Force's failures were foreseeable, given the process that it employed and its failure to ensure that prosecutors provided notice to defendants affected by problems at the FBI lab. Though the problematic thirteen FBI lab examiners worked on at least 2,893 cases during their time with the FBI, only fifteen defendants received notice of problems in the lab. See id. at 22, 42. Not surprisingly, the 2014 OIG Report "concluded that the Department [of Justice] failed  to ensure that prosecutors made appropriate and timely disclosures to affected defendants...." Id. at iii, 69.

The disturbing background with respect to the Task Force's work is not recounted here, though it is detailed in the 2014 OIG Report. See id. at 9-44. One aspect of the 2014 OIG Report deserves further discussion, however - its treatment of FBI Agent Michael Malone, the government's hair and fiber "expert" In Vasquez's trial. Malone's repeated conduct was so egregious that it warranted an entire chapter in the 2014 OIG Report.

As mentioned above. in 1997 the DOJ Task Force narrowed its review of problems in the FBI lab, focusing on thirteen examiners. At the front end of that already narrowed review process the Task Force quickly trimmed its focus further, from 2,893 cases (which, though not clear, is apparently the number of cases on which the thirteen examiners worked) to 312 cases. For those 312 cases, the FBI hired independent scientists to review the FBI examiner's work. See id. at 22. Of those 312, "162 contained hair and fiber analysis performed by Malone relating to 172 defendants." Id. at 24. Notably, Task Force members, and the independent hair and fiber experts hired by the FBI, believed that the "[c]ursory paper review" dictated by the FBI was grossly inadequate. Id. at 24-25. Even so, it "was ultimately sufficient to confirm, at least at a minimum, that there were serious problems" with all thirteen FBI examiners' Id. at 27.

These problems were most evident with respect to Malone. Not only had he "handled a disproportionately greater number of [the 312] cases than those involving any other Lab examiner," it "also became clear...that the two independent scientists who reviewed Malone's hair and fiber cases found the most egregious errors." Id. at 30. In fact, based solely on their cursory paper review, those "independent scientists deemed aproximately 96 percent of the Malone cases to be problematic in one or more areas...." Id. at 48. Those problems included:

1. Malone's repeatedly testifying that: (a) by using microscopic analysis, he could match an unknown hair to a known hair; and (b) the probability of the unknown hair

-33-

belonging to someone other than the known hair's contributor
was 1 in 5,000. The independent scientist reviewers
characterized these claims as scientifically unsupportable
and "outlandish," and said that "Malone frequently and
inappropriately testified to the probability of a match when
there was no scientific basis for doing so." Id. at 48, 53.

2. Malone's notes regarding his examinations were often
inadequate and indecipherable. See id. at 50. This is
inexcusable, considering that anyone with an eighth grader's
knowledge of the scientific method knows that it is essential
to document results so they can be verified, or refuted,
later. And when the independent reviewers could discern the
content of Malone's notes, it was apparent that his related
"testimony was often unsupportable on the basis of his bench
notes, lab reports, or accepted standards in the scientific
community." See id. at 49. Indeed, the independent reviewers
found that "Malone's testimony was consistently overstated"
and was "misleading and inaccurate." Id.

3. Malone repeatedly claimed to have personally done
tests and examinations that he did not do. See id. at 51.

4. Malone repeatedly testified that "'at least 15
characteristics are needed for a hair comparison,'" a claim
the independent reviewers said "was scientifically
unsupportable." Id. at 51-52.

5. "With regard to fiber analysis, the [independent
reviewers] wrote in their reports that they did not believe
Malone understood the appropriate use and limitations of an
instrument known as a microspectrophotometer, and therefore,
that he often came to scientifically inaccurate conclusions

-34-

in his reports and testimony." Id. at 49. Specifically,
Malone testified - in Vasquez's case and many others - that
with that instrument he could identify a specific dye that
was used to color a fiber, but the relevant literature made
clear that the instrument only allows a person to determine a
fiber's color. See id. at 50.

Based on this evidence, and more, the 2014 OIG Report
"concluded that of the 13 FBI Lab examiners whose cases the
Task Force reviewed, Malone's conduct was the most egregious.
He repeatedly created scientifically unsupportable lab
reports and provided false, misleading, or inaccurate
testimony at criminal trials." Id. at 7, 45.

Furthermore, the OIG Report stated:

> We believe the Department should have directed the Task Force
> to review all cases Malone handled at any point during his
> tenure in the FBI Lab beginning in 1975, whether as a primary,
> secondary, or confirming examiner, where the evidence was
> deemed material to the defendant's conviction. A discussion
> about potential scope expansion should have occurred no later
> than fall 1999, since the FBI and the Department learned in
> May and July 1999, respectively, after the glaring findings
> by the independent scientists, that Malone's forensic analysis
> and testimony were unreliable.

Id. at ii, 72; see also id. at 45 ("[t]he stark revelations
about Malone resulting from the Task Force's work, and the
lack of a corresponding response by the Department, the Task
Force, or the FBI exposed a major deficiency in the
Department's implementation of the Task Force, mission"). The
OIG recommended that the DOJ attempt to rectify this
situation by reviewing all cases worked on by Malone, and by
cooperating with criminal defense organizations to ensure
that adequate notice is provided to defendants. See id. at 81-
85.

-35-

The DOJ began taking such steps prior to publication of the 2014 OIG report, as it noted in its response to the OIG's report:

> As noted in the 2014 OIG Assessment, a disproportionate number of problem cases involved hair and fiber analysis or testimony - in particular by examiner Michael Malone (Malone). And, following several reports of exonerations based in whole or in part on the introduction at trial of faulty hair comparison analysis or testimony, in 2012, the FBI, in coordination with the Department, initiated a comprehensive review of microscopic hair comparison analysis or testimony provided in more than 20,000 cases prior to December 31, 1999, when mitochondrial DNA testing became routine at the FBI Lab.

> The purpose of this review, which is ongoing, is to ensure that analysis or testimony by FBI Lab personnel regarding hair comparison properly reflected the bounds of science, and that no person is or has been deprived of a fair trial based on flawed analysis or testimony.

Id. at 134.

Notably, all of the repeated Malone "errors" that are listed above were evident in Malone's testimony during Vasquez's trial. However, according to the 2014 OIG Report, Vasquez's case was not one on the 312 cases that the DOJ Task Force had reviewed by independent scientists. See id. at 103. That was confirmed in the November 26, 2015 letter from Ms. Roth at the DOJ to Vasquez. See 11/26/14 Roth Letter ("We have also confirmed that an Independent Scientific Review was not conducted in your case")(Exhibit A). To judge by the Task Force narrowing process set out in the OIG Report (at page twenty-two), that was because the prosecutors who prosecuted Vasquez's case told the Task Force that Malone's testimony was not material to the government's case.

D. October 17, 2014 Letter From DOJ Special Counsel Norman Wong

It seems evident from the 2014 OIG Report, and the FBI's response to that Report, that at some point the DOJ will

review Vasquez's case. That has not occurred yet. But Vasquez
is aware of the results of the DOJ's review of Malone's
testimony in the separate trial of Rene Martin Verdugo-
Urquidez, who was charged in the same case but was tried two
years before Vasquez. As discussed below, Malone's testimony
in Verdugo's trial was, in all relevant respects, the same in
Vasquez's trial. Accordingly, it is useful to consider the
results of the DOJ's review in Verdugo's case, and the DOJ's
positions based on that review.

In an October 17, 2014 letter, DOJ Special Counsel Norman
Wong notified Michael Pancer, one of Verdugo's trial
attorneys, that the DOJ "recently undertook a review of
certain evidence that was presented in" Verdugo's trial, and
he attached a copy of an October 10, 2014 letter that he
wrote to Stephanie Yonekura, the United States Attorney for
the Central District of California. 10/17/14 Wong/Pancer
Letter (included at Exhibit B). The letter to Ms. Yonekura,
and the attached report, provide most of the substance of Mr.
Wong's communication to Mr. Pancer.

Mr. Wong's letter to Ms. Yonekura said that after
conducting a review, the DOJ had "determined that the
microscopic hair comparison analysis testimony [of Malone in
Verdugo's trial] included statements that exceeded the limits
of science and were therefore, invalid." 10/10/14
Wong/Yonekura letter at 2 (included at Exhibit B). The report
attached to the letter says that the DOJ found two types of
error:
> 1. [Malone] stated or implied that the evidentiary hair could
> be associated with a specific individual to the exclusion of
> all others. This type of testimony exceeds the limits of science.

2. [Malone] assigned to the positive association a statistical weight or probability or provided a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to microscopic hair association. This type of testimony exceeds the limits of science.

9/11/14 DOJ/FBI Review at 1 (included at Exhibit B).

The report attached to Mr. Wong's letter also lists portions of Malone's trial testimony that the DOJ admits were "invalid." A review of those portions shows that the DOJ has repudiated all of Malone's hair testimony that linked Verdugo, Espino-Verdin, and Agent Camarena to 881 Lope de Vega, See id.

Finally, Mr. Wong's letter to Ms. Yonekura says that the DOJ "take[s] no position regarding the materiality of the error in [Verdugo's] case," and asks Ms. Yonekura to "determine the actions your office should take in light of this error," 10/10/14 Wong/Yonekura Letter at 1 (included at Exhibit B). But Mr. Wong noted that should Verdugo seek relief based on Malone's invalid testimony, the DOJ will waive any procedural defenses:

In the event that the defendant seeks post-conviction relief under 28 U.S.C. §2255, based on the Department's disclosure that microscopic hair comparison laboratory reports or testimony used in [his] case contained statements that exceeded the limits of science, in the interest of justice, the United States is waiving reliance on the statute of limitations under Section 2255(f) and any procedural-default defense in order to permit the resolution of legal claims arising from the erroneous presentation of micro-scopic hair examination laboratory reports or testimony.

Id. at 2.

It is evident that once the DOJ conducts a review of Malone's testimony in Vasquez's trial, the DOJ will conclude that testimony was also "invalid." That is because Malone's testimony was, for all relevant purposes, the same in both trials. This is evident by a comparison of the testimony in both trials. Exhibit C contains the excerpts of Malone's

-38-

testimony in Verdugo's trial that the DOJ has conceded were
erroneous, which allows for an easy comparison to Malone's
testimony in Vasquez's trial. A few examples are provided
here to establish what should be an undisputed point.

The first example relates to Malone's testified falsely
in Verdugo's trial when he said:

> What you are going to do is a three-step microscopic examination,
> and what you are doing is comparing the unknown hairs against the
> knowns in order to determine one of two things - either the
> unknown hairs is different and could not have come from that
> person, or, secondly, that they are alike and they are consistent
> with coming from that person.

8/5/88 RT at 139. Malone testified similarly in Vasquez's

trial:

> [I]f the two hairs are what we call absolutely indistinguishable,
> so it looks like the same hair, the same characteristics, the
> same arrangement, we then say this hair microscopically matches
> the hairs of that person, and therefore, this hair is consistent
> with coming from that individual.

6/19/90 RT at 121.

Finally, with respect to Malone's summary of his
opinions, the DOJ has recognized that Malone testified
falsely in Verdugo's trial when he said:

> Based on the fact that I was able to associate Special Agent
> Enrique Camarena to 881 Lope de Vega in five different ways -
> hair, two types of fibers, fabric and rope - and that each of
> these are an independent event, independent of one another, in
> my opinion the only possible way this could have happened is
> if Special Agent Camarena would have been at 881 Lope de Vega
> and the Volkswagen and the Mercury and in a position with
> respect to the Volkswagen, the guest house, and bedroom 4
> where his hairs could have been forcibly removed.

8/5/88 RT at 189. Malone said almost the same thing in
Vasquez's trial:

> In view of the fact that I had five separate and distinct
> associations between Special Agent Camarena and 881 Lope de
> Vega - that is, a hair sample, two different kinds of carpet
> fibers, a fabric match, and a rope match - in view of these
> five separate independent events, I conclude that at some point
> in time Special Agent Camarena was at 881 Lope de Vega. And
> with respect to the guest house and bedroom number 4, in a
> position where his hairs could be forcibly removed.

-39-

6/19/90 RT at 159. There are many similar comparisons between Malone's testimony in the two trials, but they are not belabored here because Vasquez expects that the government will concede this point.

The upshot is that the DOJ has, effectively, repudiated Malone's testimony in Vasquez's trial. Accordingly, Vasquez expects that the DOJ will make the same concession in his case (i.e., to not raise any procedural bars to addressing the merits of Vasquez's Napue claim) that it has made in Verdugo's case. The discussion below proceeds consistent with that expectation.


THE COURT SHOULD VACATE VASQUEZ'S CONVICTIONS BECAUSE MALONE'S "INVALID" TESTIMONY WAS KEY TO THE GOVERNMENT'S CASE

A. Introduction

Because Malone's testimony was false, Vasquez seeks to "vacate, set aside, or correct [his] sentence" under 28 U.S.C. §2255(a). Vasquez first summarizes the relevant law, then turns to the merits.

B. Relevant Law

"One of the bedrock principles of our democracy, 'implicit in any concept of ordered liberty,' is that the State may not use false evidence to obtain a criminal conviction." Hayes v. Brown, 399 F.3d 972, 978 (9th Cir. 2005)(en banc)(quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)). "[T]o permit a conviction based on uncorrected false evidence to stand is a violation of a defendant's due process rights...." Maxwell v. Rose, 628 F.3d 486, 507 (9th Cir. 2010). That principle holds even if the government did not

-40-

knowingly present the false evidence:

> [A] government's assurances that false evidence was presented
> in good faith are little comfort to a criminal defendant wrongly
> convicted on the basis of such evidence. A conviction based in
> part on false evidence, even false evidence presented in good
> faith, hardly comports with fundamental fairness. Thus, even if
> the government unwittingly presents false evidence, a defendant
> is entitled to a new trial if there is a reasonable probability
> that without the evidence the result of the proceeding would
> have been different.

United States v. Young, 17 F.3d 1201, 1203-4 (9th Cir.

1994)(quotation and brackets omitted); see also Maxwell v.

Rose, 628 F.3d 486, 507 (9th Cir. 2010)(same); Killian v.

Poole, 282 F.3d 1204, 1208 (9th Cir. 2002)(same).

To warrant reversal due to presentation of false

evidence, a defendant must show that the evidence was

material to his conviction. Notably, the materiality test for

a Napue/false evidence claim is broader that the materiality

test for a Brady claim. See United States v. Jackson, 513

F.3d 1057, 1076 (9th Cir. 2008). As this Court explained in

Jackson:

> Whereas a Brady violation is material when "there is a
> reasonable probability that... the result of the proceeding
> would have been different," Bagley, 473 U.S. at 682 (emphasis
> added), a Napue violation requires that the conviction be set
> aside whenever there is "any reasonable likelihood that the
> false testimony could have affected the judgement of the jury."
> Hayes v. Brown, 399 F.3d 972, 985 (9th Cir. 2005)(en banc)
> (emphasis added)(internal quotaion marks omitted).

Jackson, 513 F.3d at 1076. Because of this liberal standard

for granting relief, the Court has gone so far as to say that

"if it is established that the government knowingly permitted

the introduction of false testimony reversal is virtually

automatic." Hayes, 399 F.3d at 978 (quoting United States v.

Wallach, 935 F.2d 445, 456 (2d Cir. 1991)); see also Killian,

282 F.3d at 1208 (same).

-41-

C. Relief Is Warranted

There is no question that Malone presented a great deal of false evidence during Vasquez's trial. And given Malone's documented history, there can be little doubt that he did so knowingly and intentionally. As this Court has said, in such cases reversal is "virtually automatic." See Jackson, 513 F.3d at 1075 ("'knowing' use of perjured testimony applies when any of the State's representatives would know the testimony was false"); Boyd v. French, 147 F.3d 319, 329 (4th Cir. 1998)("knowingly false or misleading testimony by a law enforcement officer is imputed to the prosecution"); Curran v. State of Delaware, 259 F.2d 707, 713 (3d Cir. 1958)(same); Napue, 360 U.S. at 269 (citing approvingly to Curran). After all, it stands to reason that if an FBI agent takes the perilous step of knowingly introducing false expert evidence, the evidence must be important.

Even if the Court were not to rely on the "automatic reversal" principle, it is apparent that Malone's false testimony was material. It "was the centerpiece of the prosecution's case," which is evident from the fact that the prosecutor relied so heavily on the testimony during his closing argument. Maxwell, 628 F.3f at 508; Hall v. Dir. of Corrections, 343 F.3d 976, 984 (9th Cir. 2003)(stating that prosecutor's reliance on evidence in closing supports a finding of materiality); Killian, 282 F.3d at 1209-10. (same). It also provided "expert" corroboration for the other evidence against Vasquez, which was the extremely suspect testimony of Cervantes. Cervantes's testimony was so weak that the prosecutor actually said that he would not "go into

-42-

[the many inconsistencies] because I'd be here far too long, more than you could stand." 7/13/90 RT at 39, 42. The prosecutor avoided that inconvenience by using Malone's testimony to bolster what Cervantes had claimed, stating:

> And furthermore, you know that the hair at Lope de Vega was not there one or two years. You know that because starting from January 1985 on, that place had been refurnished, repainted and recarpeted. It had been sanitized. So anything found after January had to be put there by people who were there after January. And after January, Camarena was abducted and tortured in the guest house, and Matta was there, ladies and gentlemen.
>
> That's the explanation. And this corroborates Cervantes when he tells you these meetings occurred. This troubles [defense counsel] when I make that argument to you, but that's one of the strongest arguments in this case.

7/13/90 RT at 58.

Malone's testimony was not just the centerpiece of the government's case, it was essential to establish at Vasquez's trial both that his codefendant's had actually joined the conspiracy to kidnap agent Camarena and that they participated in the kidnapping. As for the latter, without the hair evidence there was no evidence that Vasquez co-defendant's participated in the kidnapping. As for the former, Cervantes's testimony about the October 1984 wedding meetings did not show that a conspiracy had been formed at that time. Instead, as the prosecutor acknowledged during closing argument, Cervantes's testimony indicated that in October 1984 the "members of this enterprise, the leaders, particularly, are trying to formulate a strategy and plan as to how to deal with this agent, whoever that may be, who's causing us all these problems. 7/11/90 RT at 109. Those sorts of discussions, even if they did occur, do not indicate that a conspiracy was formed at that time, much less that Vasquez

-43-