NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
TIMOTHY J. SEARIGHT (Cal. Bar No. 151387)
Assistant United States Attorney
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3749
    Facsimile: (213) 894-0142
    E-mail:   timothy.searight@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAVIER VASQUEZ-VELASCO,<br><br>          Petitioner/Defendant<br><br>          v.<br><br>UNITED STATES OF AMERICA,<br><br>          Respondent/Plaintiff. | No. CV 16-09685-JAK<br>(CR 87-422-JAK)<br><br>GOVERNMENT'S OPPOSITION TO MOTION TO VACATE, SET-ASIDE AND CORRECT SENTENCE FILED PURSUANT TO 28 U.S.C. § 2255 |

The government, by and through an attorney of record, Assistant United States Attorney Timothy J. Searight, hereby files opposition to petitioner Javier Vasquez-Velasco's motion to vacate, set-aside and correct sentence filed pursuant to 28 U.S.C. § 2255.  The government's opposition is based on the attached memorandum of

///

///

///

///

///

///

points and authorities, the transcripts from the underlying trial in this case, and such argument as is advanced at any hearing on the motion.

Dated:  May 14, 2018                  Respectfully submitted,

                                      NICOLA T. HANNA
                                      United States Attorney

                                      LAWRENCE S. MIDDLETON
                                      Assistant United States Attorney
                                      Chief, Criminal Division


                                           /s/
                                      _____
                                      TIMOTHY J. SEARIGHT
                                      Assistant United States Attorney

                                      Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

## TABLE OF CONTENTS

PAGES

TABLE OF AUTHORITIES...............................................ii

I.    INTRODUCTION...................................................1

II.   STATEMENT OF THE CASE.........................................2

III.  SUMMARY OF TESTIMONY AND EVIDENCE AT TRIAL...................7

IV.   ARGUMENT.....................................................19

      A.    Standard of Review.....................................21

      B.    The Testimony of SA Malone Was Not Material to the
            Charges on Which Defendant Was Convicted.................22

            1.    No Bolstering of Cervantes Was Needed or Material
                  to Show Defendant's Connection to the Murders at
                  La Langosta.........................................22

            2.    The Testimony of SA Malone Was Not Material to
                  Finding Defendant's Connection to the
                  Racketeering Enterprise And the Facts at La
                  Langosta............................................26

            3.    Cumulatively, and in the Total Context of the
                  Evidence at Trial Against Defendant, the
                  Testimony of SA Malone Was Not Material to
                  Defendant's Convictions.............................28

V.    CONCLUSION...................................................32

**TABLE OF AUTHORITIES**

PAGES

**Federal Cases**

United States v. Vasquez-Velasco,
   15 F.3d 833 (9th Cir. 1994) ............................. 4, 5

Hazel-Atlas Glass Co. v. Hartford-Empire Co.,
   322 U.S. 238 (1944) ...................................... 5

Napue v. Illinois,
   360 U.S. 264 (1959) ..................................... 20

United States v. Zuno-Arce,
   339 F.3d 886 (9th Cir. 2003) ............................ 21

Hayes v. Brown,
   399 F.3d 972 (9th Cir. 2005) ............................ 21

United States v. Agurs,
   427 U.S. 97 (1976) ...................................... 21

United States v. Bagley,
   473 U.S. 667 (1985) ..................................... 21

Smith v. Cain,
   564 U.S. 73 (2012) ...................................... 21

Jones v. Ryan,
   691 F.3d 1093 (9th Cir. 2012) .............. 21, 22, 24, 32

Morris v. Ylst,
   447 F.3d 735 (9th Cir. 2011) ............................ 22

Hall v. Director of Corrections,
   343 F.3d 976 (9th Cir. 2003) ............................ 22

United States v. Matta-Ballesteros,
   71 F.3d 54 (9th Cir. 1995) .............................. 25

**Federal Statutes**

28 U.S.C. § 2255 ..................................... passim
18 U.S.C. § 1959 ......................................... 3

# I.

## <u>INTRODUCTION</u>

In 2016, petitioner-defendant Javier Vasquez-Velasco ("defendant") filed a 28 U.S.C. § 2255 motion to set aside his convictions after jury trial for the deaths in January 1985 of two tourists, John Walker and Alberto Radelat.  On April 14, 2018, through the assistance of counsel, he filed a supplemental brief in support of the motion.  In at least the supplemental brief, defendant stridently argues that the convictions obtained 30 years ago against him for the deaths of two tourists at La Langosta restaurant were "built on a fiction," the result of "many distortions and outrageous misconduct."  (Def. Supp. Mot., p. 1.)  Defendant says that testimony by FBI Special Agent Malone concerning two murders for which defendant was <u>not charged</u> operated as a "papal blessing" over other testimony relevant to defendant's crimes, and in particular the testimony of a government witness, Hector Cervantes-Santos ("Cervantes").

A simple reading of the record shows that defendant's convictions for the deaths of the tourists were supported by a variety of evidence from many different sources entirely unrelated to SA Malone.  In his recitation of the trial facts, defendant studiously ignores the more than three hours of <u>Mirandized</u>, recorded statements by defendant, which statements were far more probative and inculpatory than anything that witness Cervantes offered in connection with defendant.  Defendant also omits his wife's trial testimony, which established defendant's consciousness of guilt through his attempt to construct an elaborate, false alibi for the night defendant participated in the murders predicating his

1

convictions.  And only near the end of his brief does defendant acknowledge the eyewitness testimony of Enrique Plascencia Aguilar -- whom defendant termed in closing argument at trial as "the government's entire case."

Looking through the hyperbole and indignation of defendant's brief, what is left are disjointed efforts to tie all evidence back to Malone, and a studied avoidance of the facts and evidence that actually implicated defendant.

Defendant's motion should be denied.

**II.**

**STATEMENT OF THE CASE**

On February 5, 1990, petitioner-defendant Javier Vasquez-Velasco ("defendant") and others were arraigned on a sixth superseding indictment.  (Ex. 1.)[1]  Count One of the sixth superseding indictment charged defendant with aiding, abetting, counseling, inducing, procuring, causing and otherwise willfully participating in the murder of John Walker, in furtherance of a racketeering enterprise, in violation of 18 U.S.C. § 1959.  (Ex. 1, p. 7.)  Count Two charged defendant with aiding, abetting, counseling, inducing, procuring,

---

[1]     Because of the many docket sheets in this case, the government is filing exhibits to this motion, referred to as "Ex." and followed by the page number within the Exhibit.  Ex. 1 is the operative indictment for the defendant in this case.  Ex. 2 is the docket in the underlying criminal case, that is, United States v. Caro-Quintero, et al, CR 87-422.  However, because this docket sheet is lengthy, Ex. 2 contains excerpts of that docket sheet.  Ex. 3 through 7 are the complete dockets sheets from the post-trial challenges to the conviction of defendant and related defendants Rene Martin Verdugo-Urquidez and Juan Ramon Matta-Ballesteros.  Ex. 8 is the Court's order granting a new trial in the Matta case, that is, Matta-Ballesteros v. United States, CV 16-2596-JAK.  The docket sheet for this motion is Ex. 9.  In describing trial proceedings, the government has cited to the Reporter's Transcript ("RT") followed by the volume and page numbers.

causing and otherwise willfully participating in the murder of
Alberto Radelat, in furtherance of a racketeering enterprise, in
violation of 18 U.S.C. § 1959. (Ex. 1, p. 9.)  Defendant was not
charged in any other counts of the indictment. (Ex. 1.)  On May 8,
1990, defendant proceeded to trial with three co-defendants, Juan
Ramon Matta-Ballesteros, Ruben Zuno-Arce, and Juan Jose Bernabe-
Ramirez.

On July 16, 1990, the district court read instructions to the
jury. (RT 31:2-36.)  The Court described the charges against each
defendant, and the elements of each charge. (Id.)  The Court told
the jury, "You are here only to determine whether each of the
defendants is guilty or not guilty of the charges against him in the
indictment . . . .  You should consider evidence about the acts,
statements, and intentions of others or evidence that other acts of
each of the defendant only as they relate to these charges against
that defendant." (RT 31:9.)  The Court further instructed the jury
that, "a separate crime is charged against one or more of the
defendants in each count.  The charges have been joined for trial.
You must decide the case of each defendant on each crime charged
against that defendant separately.  Your verdict on any count as to
any defendant should not control your verdict on any other count or
as to any other defendant." (RT 31:9-10.)  Finally, the Court
informed the jury that defendant "is charged in counts one and two
only.  No other defendant was charged in those counts." (RT 31:12.)
Defendant made a motion for severance "prior to trial, during trial,
and at the conclusion of the government's case." United States v.
Vasquez-Velasco, 15 F.3d 833, 845 (9th Cir. 1994).  These motions
were denied.

3

On August 6, 1990, defendant was convicted on each of the two counts with which he was charged.   (Ex. 2, p. 162.)

Defendant filed a notice of appeal of his conviction and sentence on May 28, 1991.  (Ex. 2, p. 187.)   The Ninth Circuitt affirmed, holding that the district court had subject matter jurisdiction, that defendant's trial was properly joined with that of his co-defendants, and that the district court did not err in failing to give a special verdict regarding conspiracy or participation. Vasquez-Velasco, 15 F.3d at 848.  In affirming the district court's denial of defendant's severance motions, the Ninth Circuit relied on the jury instructions, the factual circumstances of the joined offenses, and the verdicts in the case.  (Id. at 846.)  The Ninth Circuit noted that the trial court "carefully instructed the jury" as to evidence that could not be used against defendant, and instructed the jury "not [to] be swayed by their emotions."  (Id.)  The Ninth Circuit also noted that the murders with which defendant was charged and the murders with which his co-defendants were charged "were separate incidents that occurred approximately a week apart," and therefore "were discrete acts that a jury could compartmentalize reasonably easily."  (Id.)  Finally, the Ninth Circuit found that joinder was proper in light of the "discrete and selective verdicts against each of the four codefendants" that the jury returned on four separate days, which provided evidence of the jury's "ability to compartmentalize both the charges and the evidence."  (Id.)

On May 23, 1997, defendant filed his initial motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255, which was later consolidated with defendant's § 2255 motion filed on November 10, 1997.  (Ex. 2, p. 247; Ex. 3, p. 2.)   Therein, defendant alleged

4

that there was newly-discovered evidence, that a government witness at trial, Hector Cervantes-Santos ("Cervantes"), recanted his trial testimony.  (Id.)  On February 23, 1999, the district court denied defendant's motion.  (Id.)

On April 8, 1999, defendant filed a notice of appeal and a petition for certificate of appealability of the district court's denial of his § 2255 motion.  (Id.)  The district court denied the petition for certificate of appealability on April 19, 2000.  (Id.)  On August 23, 2001, the Ninth Circuit denied defendant's request for a certificate of appealability, viewing it as a request for permission to file a successive 28 U.S.C. § 2255 motion.  (Ex. 3, p. 3.)

On April 9, 2014, defendant filed a motion for "fraud upon the court" pursuant to Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944).  (Ex. 3, p. 3.)  On November 24, 2014, the district court denied the motion, finding that the motion raised the same claims presented in defendant's original § 2255 motion, that is, the allegation that witness Cervantes provided false testimony at trial, and therefore that it constituted a second or successive § 2255 motion which defendant had not received authorization to file.  (Ex. 3, p. 6.)

On September 15, 2015, a defendant, Rene Martin Verdugo-Urquidez, named in the same series of indictment as defendant, filed a successive 28 U.S.C. § 2255 motion.  (Ex. 4, p. 2.)  On November 12, 2015, a co-defendant, Juan Ramon Matta-Ballesteros, filed a

successive 28 U.S.C. § 2255 motion.[2]  (Ex. 5, p. 2.)  On May 22, 2017, this Court granted the motions in the <u>Verdugo</u> and <u>Matta</u> cases. (Ex. 4, p. 7; Ex. 5, p. 6.)

On December 23, 2016, defendant filed a successive motion pursuant to 28 U.S.C. § 2255 to vacate, correct or set-aside his sentence.  (Ex. 6, p. 2.)  On April 12, 2017, after motion by the government, this Court denied defendant's petition, without prejudice, for failure to obtain permission from the Ninth Circuit to file a successive motion.  (Ex. 6, p. 3.)

On November 25, 2016, defendant sought permission from the Ninth Circuit to file a successive 28 U.S.C. § 2255 motion.  (Ex. 7, p. 3.) On February 16, 2018, the Ninth Circuit granted defendant's request. (<u>Id.</u>)  At the direction of the Ninth Circuit, this Court ordered defendant's motion filed as of November 7, 2016.  (Ex. 9, p. 2.)  On April 16, 2018, defendant filed a supplemental motion pursuant to 28 U.S.C. § 2255.  (<u>Id.</u>)

---

[2]    In each instance, as the result of false testimony by a testifying forensic evidence witness, FBI Special Agent Michael Malone, the government did not oppose the filings of the motions on procedural grounds, but argued that SA Malone's testimony was not material to the outcome of the cases.  (Ex. 4, p. 5; Ex. 5, p. 5.) In this case, as with the <u>Verdugo</u> and <u>Matta</u> cases, the government does not dispute that there was error in the presentation of forensic hair testimony and evidence by SA Malone in the trial with defendant, and the government is not disputing the attribution of the evidence to the prosecution team.  On April 20, 2018, the DOJ issued a letter to the United States Attorney's Office, Central District of California, describing errors in SA Malone's testimony at defendant's trial.  The DOJ had earlier indicated that, in light of such errors, the government should not oppose the filing of successive 28 U.S.C. § 2255 motions on procedural grounds, though the issue of materiality remains an available argument.  For defendant, a procedural waiver is now moot, as the Ninth Circuit granted permission for a successive petition.

## III.

## SUMMARY OF TESTIMONY AND EVIDENCE AT TRIAL

The evidence at trial was that, on January 30, 1985, defendant and several others, including two of his brothers, helped beat and murder two civilians at La Langosta restaurant in Guadalajara, Mexico, after mistaking them for DEA agents. (RT 10:160-62, 19:85, 89-90.) The victims were John Walker and Alberto Radelat. (RT 6:63, 84, 100.) Walker was a United States citizen, and Radelat was a lawful permanent resident of the United States. (RT 6:47, 86.) They were both tourists in Guadalajara, planning to return to the United States a few days later, when they entered the restaurant. (RT 6:50, 84, 87.)

The evidence at trial indicated that, approximately a week later, on February 7, 1985, some of the same persons involved in the killings of the tourists -- though not defendant -- kidnapped and murdered DEA Special Agent Enrique Camarena ("SA Camarena") and an informant, Alfredo Zavala, with whom SA Camarena worked, at a residence on Lope de Vega street in Guadalajara. (RT 10:189, 11:12.)

Defendant proceeded to trial with three co-defendants, Juan Ramon Matta-Ballesteros, Ruben Zuno-Arce and Juan Jose Bernabe-Ramirez. The evidence at trial as to Matta and Zuno primarily pertained to their presence and participation in meetings at which the abduction of SA Camarena was planned, though there was testimony from SA Malone that hair from Matta was found at the Lope de Vega house. (RT 7:20-27; 16:207.) For Bernabe, there were statements from him that he was present at the Lope de Vega house when SA Camarena was held there, and there was a United States law enforcement witness to Bernabe assisting Caro in his flight from

7

Mexico shortly after the abduction of SA Camarena.  (RT 11:35, 18:17.)

Summarized approximately in the order it was presented at trial and focusing on the evidence relevant to defendant, the testimony and evidence was that, in 1985, there was a group of three traffickers, Rafael Caro-Quintero ("Caro"), Ernesto Fonseca-Carrillo ("Fonseca"), and Miguel Felix-Gallardo, who operated a large enterprise engaged in the cultivation of marijuana, and importation of cocaine to Mexico, and the export of those drugs to the United States.  (RT 1:116, 132, 3:52.)  These persons were frequently present in Guadalajara.  (RT 1:117.)  There was evidence introduced from law enforcement and civilian eyewitnesses that the Guadalajara traffickers had corrupted Mexico federal and local officers, that officers were taking bribes, and were working to slow the efforts of the DEA agents.  (RT 1:187, 3:114, 5:49.)  Fonseca and Caro also worked with a lawyer, Javier Barba-Hernandez ("Barba").  Barba owned a house in Guadalajara known as "La Quinta."  (RT 19:46, 69, 121.)

By late 1984, the DEA agents in Guadalajara had substantial success in drug interdiction efforts against the traffickers.  On May 24 through May 27, 1984, in Zacatecas state, which is north and adjacent to Jalisco state in which Guadalajara is located, agents seized 10 tons of marijuana, 200 liters of "hash oil," and destroyed more than 150 acres of marijuana under cultivation.  (RT 1:152-55.)  On November 8, 1984, agents destroyed more than 6,000 tons of marijuana at fields in Chihuahua State, near the town of Bufalo.  (RT 5:35.)

In addition to the interdiction efforts, agents had identified several locations frequented by the traffickers in Guadalajara,

including a place where there was a clandestine radio transmitter (in the days before cellular telephones), and a seafood restaurant at which the traffickers congregated, "La Langosta." (RT 6:27.)

Special Agent Thomas Gomez, with the DEA, testified that, based on recent actions by the traffickers, in October 1984 he was sent with other agents to be part of a special surveillance team operating in Guadalajara. (RT 6:26.) SA Gomez testified that the locations on which they focused included a building suspected of being a communications center and housing radio equipment, and La Langosta restaurant. (RT 6:27.) As to La Langosta restaurant, SA Gomez testified, "The Special-Agent-In-Charge in Guadalajara at that time, James Kuykendall ... advised us to stay out of there." (RT 6:42.)

The eyewitness at trial to the events at La Langosta was Enrique Plascencia-Aguilar ("Plascencia"). Plascencia said that in the 1970s and 1980s, he worked in law enforcement positions in Guadalajara, but also as a driver and bodyguard to an associate of the traffickers, Antonio Garate-Bustamante ("Garate"). (RT 6:120-21.) Plascencia initially testified about a meeting at a house of Fonseca's -- "La Bajadita" -- at which Garate, Fonseca, defendant and several others were present. (RT 6:125-28.) In that meeting, Fonseca showed a photograph of SA Camarena with an associate of Garate's, and said to Garate, "The kind of friends you have." (RT 6:130.) Plascencia could not identify defendant in court, and before turning to the facts of La Langosta, the Court delayed Plascencia's testimony to discuss the issue of photographic identification.[3] (RT 6:164.)

---

[3]   The Court later ruled that the photographic identification of defendant was sufficient for the testimony to be relevant. (RT 19:27.)

Plascencia testified that in 1984, both he and defendant worked at the same Mexico federal I.P.S. office in Guadalajara.[4]  He stated that they shared a common supervisor, Sergio Espino-Verdin ("Espino").  (RT 19:45.)  Plascencia said that defendant had at least two brothers that also worked with the traffickers. (RT 6:137, 19:50.)

Plascencia testified that, in January 1985, there was a day when he left work at the I.P.S. at approximately 2:00 p.m., and went with several associates to La Langosta restaurant.[5]  (RT 19-60.) Plascencia said he had been there several times before.  (RT 19:66.) He said that, when they went inside, Rafael Caro-Quintero and Barba were there with a group of men.  (RT 19:60.)  Caro directed that a table be set up for Plascencia and the men.  (RT 19:61.)  Plascencia said defendant was seated with some of his brothers and other guards at a table in the same area as Caro.  (RT 19:73.)  Approximately a half-hour later, Fonseca arrived.  (RT 19:72.)  Plascencia said that he and his associates remained at La Langosta until approximately 7:00 p.m. when they went outside to the van in which they had arrived.  (RT 19:78.)

As they were preparing to leave, they observed two persons walk into La Langosta restaurant.  (RT 19:82.)  Plascencia described how they were dressed, and that the first one entering the restaurant was wearing shorts, had "a photographic camera, and a canvas hat of the kind that the Marines use here in the United States."  (RT 19:82.)

---

[4]    The government is unable to find a statement in the trial transcripts for what "I.P.S." stands.  An internet search indicates it is for "Investigaciones Politicas y Sociales."

[5]    Though witnesses testified from photographs of La Langosta, there was no crime scene processing at the restaurant.

10

The restaurant had "swinging doors, bar-style doors," and as he looked in, Plascencia said it looked as if the first man had fallen. (RT 19:61, 85.)  He saw that the two men were being beaten.  (Id.) Specifically, Plascencia said that approximately 10 to 15 men were beating the two persons, and that they carried them to a storage room in the restaurant.  (RT 19:89.)  Plascencia identified the particular persons engaged in the beatings, including defendant and his two brothers, Eliseo and Antonio. (RT 19:89-90.)  Plascencia stated as follows:

> Gov't:  As the two men, the two victims, are being carried
> and beaten, are you table to get a good look at the face of
> [defendant]?
>
> Plascencia:  Yes.
>
> [  . . .  ]
>
> Gov't:  Tell us what you saw [defendant] doing.
>
> Plascencia:  Well, he was hitting him.

(RT 19:93, 94.)

On cross-examination, Plascencia was asked about his ties to Fonseca and Caro, and whether his ties to the traffickers were contrary to his work as an I.P.S. officer.  (RT 19:103, 111-12.) Plascencia stated that Luis Gonzalez Ontiveros ("Ontiveros") was the leader of the group with whom Plascencia travelled to La Langosta, and Plascencia stated that, like himself, Ontiveros did not reenter the restaurant when the tourists were being beaten.  (RT 19:104-05.) Later in the trial, defendant introduced a report about an interview with Ontiveros in which Ontiveros admitted to being directly involved

in the murders of the tourists.[6]  (RT 27:40, 29-6.)  Also admitted,
however, was a subsequent report in which Ontiveros recanted being
present at La Langosta.[7]  (RT 29:6.)

Hector Cervantes-Santos ("Cervantes") testified that, that in
the early 1980s, he began working for Barba, and that he was the
chief of security at Barba's "safe house," known as "La Quinta," from
December of 1982 to March of 1985.  (6:172-74, 7:4, 8:38.)  Cervantes
said that defendant was frequently at the house, with his brothers,
and in the role of bodyguard to Barba.  (RT 6:180-82, 7:29.)
Cervantes said that he recalled Zuno providing Barba with official
credentials for defendant, his two brothers, and two other persons.
(RT 7:9.)  He said there were two social events, a baptism and a
wedding, in which persons had gathered at the house, including
defendant.  (RT 6:179, 7:26.)  Cervantes said that, on two occasions,
there were discussions about "picking up" a DEA agent.  Defendant was
at the house on these occasions, though it was unclear that he
participated in the meetings.  (RT 7:21-22, 26, 43.)

Cervantes said that Barba went frequently to La Langosta
restaurant, and kept a tab there.  (RT 7:31.)  Cervantes said that he
recalled a day in January 1985 in which Caro called to La Quinta.
Caro told Cervantes to tell Barba that he would be at La Langosta.
(RT 7:30.)  Cervantes said Barba left the house with defendant.
(RT 7:31.)  Cervantes did not go with them.  (RT 7:31.)  Cervantes

---

[6]     In the trial, the document was described as "a cable" from
DEA Special Agent Robert Castillo, and was introduced as defense
exhibit P.  (RT 27:40, 28:188.)

[7]     Defendant's supplemental motion also quotes from a book,
*Desperados*, by a Time magazine reporter that describes Gonzalez'
involvement in the murders of the tourists.  Def. Supp. Mot., p. 45-
6.  But defendant does not explain how this book could in any way be
said to be a part of the trial record.

12

stated that Barba returned to the house several hours later in the company of defendant's brother, Antonio. (RT 7:32.) Cervantes said that Barba had blood on his person. Specifically, Cervantes said the blood "was on the gun, on the handle of the gun, it was on the boots, pants, jacket, and his hands still had blood on them." (RT 7:32.) As to defendant, Cervantes testified as follows:

> Gov't: On this same date, do you ever see [defendant] at La Quinta again?
>
> Cervantes: No. The following day.
>
> Gov't: Does he arrive at the house?
>
> Cervantes: Yes.
>
> [ . . . ]
>
> Gov't: What does [defendant] state to you?
>
> Cervantes: That he's going to let attorney Javier Barba Hernandez know that both Americans had died.
>
> Gov't: Did he indicate where they had died?
>
> Cervantes: No.
>
> Gov't: Did he indicate how they had died?
>
> Cervantes: Well, he only said that they had taken some ice picks with them. And I don't know if that's how they died or some other way.

(RT 7:38.) After the last statement by Cervantes, however, the Spanish language translator corrected the statement as follows:

> It should have been that they had been stabbed with ice picks. I don't know whether that was how they died or not.

(Id.)

Cervantes related two additional incidents involving defendant. Cervantes related an incident in which Barba directed defendant and his brother, Eliseo, to take a truck to Mascota (approximately 150

13

miles west of Guadalajara), where several tons of marijuana were buried.  (RT 7:46-48.)  Lastly, sometime later, Cervantes stated he was at the La Quinta house and there was "a phone call" from defendant, and that defendant wanted to speak with Barba.  (RT 7:50.)  Cervantes stated:

> Gov't:  Does [defendant] tell you what it is that he had to tell Barba?
>
> Cervantes:  Yes.
>
> Gov't:  What?
>
> Cervantes:  That Pavon [Armando Pavon Reyes] had killed everybody in the Bravo family.  [ . . . ]  And that the bodies were there at La Primavera, and that they would have to be moved because it belonged to Don Ruben [co-defendant Ruben Zuno-Arce], and that Don Ruben would be in trouble.

(RT 7:51-2.)  Cervantes testified that, after conveying the message to Barba, Barba called defendant, told him "that what had been done was bad," and "that they should take the bodies away from there."  (RT 7:53.)

On cross-examination, defendant brought out that Barba owned several cars, and that one of them was equipped with a telephone.[8]  (RT 8:51.)  It was brought out that Barba was deceased at the time of the trial, and that Cervantes had not reported the activities of the traffickers, including the plans to kidnap a federal agent, to law enforcement.  (RT 8:56-57.)

---

[8]    Lawrence Harrison testified that he built a radio system for Fonseca that operated on Mexico government frequencies.  He said that the system had four signal "repeaters" in and around Guadalajara, and at least 50 radios.  (RT 13:95.)  Harrison said that it "was a system that was designed to eliminate the need for outside antennas on the cars or the houses, so as to elude detection."  (Id.)  Harrison said that he also knew Espino and Barba, and that Barba eventually became a "partner" with Fonseca.  (RT 13:117.)

Special Agent Abel Reynoso ("SA Reynoso") testified about a series of interviews he conducted with defendant in July and August 1989. On July 12, 1989, SA Reynoso interviewed defendant for the first time. (RT 10:111.) Defendant told SA Reynoso that he had information to provide to law enforcement, but that he needed to talk to his brothers before providing the information. (RT 10:111.) Defendant said he was hoping for "a deal," and his life would be in danger if he provided the information. (RT 10:112.)

Special Agent Reynoso said that he spoke to defendant again two days later, on July 14, 1989. SA Reynoso tape recorded the interview on two 90-minute cassettes and part of a third cassette. (RT 10:113.) Defendant said he had several brothers, including two older brothers, Antonio and Eliseo. (RT 10:170.) He stated that his brothers worked with Espino, and that they also went to Barba's house. (RT 10:155.) Defendant said that he went to La Quinta on several occasions. (RT 10:154.) He said that he was part of this group that included, in addition to his brothers, Ezequiel Godinez also known as "El Primo." (RT 10:157.) He stated that Espino, whom he described as a "government commander," provided official credentials to himself and his brothers. (RT 10:119, 10:156.) Defendant said that he knew Ernesto Fonseca-Carrillo and had met Rafael Caro-Quintero. (RT 10:154, 10:159.) Defendant said he was present at a variety of social events at which the traffickers were present. (RT 10:124.)

Defendant said that he went to the marijuana plantations in Zacatecas with his brothers and helped load tanker trucks with marijuana. (RT 10:164.) He said he helped load a tanker truck capable of holding 40,000 pounds of marijuana, and he observed Mexico

15

federal police officers at the marijuana fields and helping guard the marijuana. (RT 10:164-65.) Defendant said that his brothers Eliseo, Manuel and Ricardo were also at the fields, and his cousin, Antonio Ochoa, was also there.

Defendant indicated that he was not present at La Langosta when the two persons were assaulted. (RT 10:160.) He said that, at that time, the traffickers were very nervous because of the seizure in Chihuahua. (RT 10:160, 213.) He related considerable detail about the facts of La Langosta, however, stating that he heard it from other persons, including his brother, Eliseo. (RT 10:160.) SA Reynosa related the following conversation:

> Gov't: And in his conversation with you, did he go into very specific detail about what he knew about La Langosta?
>
> SA Reynosa: Yes. He did say that he was told by Eliseo and he said other people talked to him about it. That these two Americans went in there, they were tortured. They were beaten and tortured and eventually taken out to a field a few miles outside of Guadalajara and were eventually killed.
>
> Gov't: And killed at the fields?
>
> SA Reynosa: Yes, sir.
>
> [ . . . ]
>
> Gov't: Still addressing La Langosta, Agent Reynoso, did defendant Vasquez indicate to you whether or not the two Americans had been questioned or interrogated at the restaurant?
>
> SA Reynosa: Yes, he did say that. He said that they were questioned – [defendant] told me that the main question they asked was they wanted to know if they were police officers or policemen [ . . . ] He said, I believe, that after the two individuals were tortured, one of them finally gave in and admitted to – yes, yes, I am a policemen.
>
> [ . . . ]

> Gov't:  Did defendant Vasquez indicate to you why the two
> Americans first said no, they were not police officers and
> then later said they were?
>
> SA Reynosa:  He inferred because of the torture.  That's
> what happened after all the torture took place; they
> finally gave in because they were afraid — they were told,
> you know, tell us and we won't hurt you.

(RT 10:161-62.)

Defendant also related what the specific circumstances of the deaths of the persons:

> Gov't:  Did [defendant] tell you what he knew about who
> killed the Americans?
>
>                       [  . . .  ]
>
> SA Reynosa:  He said one of the participants was the man
> known as El Primo.
>
> Gov't:  What did he say about El Primo?
>
> SA Reynosa:  That he was the one that actually had killed
> these two Americans.  That he was told that El Primo — the
> night that the events took place, El Primo was seen full of
> blood.  His clothing was full of blood.

(RT 10:163.)  Defendant also said El Primo participated in the torture of the Americans.[9]  (Id.)

Defendant told SA Reynoso that he went into hiding after the arrest of Fonseca.  (RT 10:126.)

A variety of evidence was introduced that SA Camarena was kidnapped on February 7, 1985, approximately a week after the incidents at La Langosta.  (RT 11:12, 10:189.)  The evidence indicated that he and Zavala were brought to a residence at 881 Lope de Vega Street in Guadalajara, where SA Camarena was interrogated,

---

[9]    On direct examination of SA Reynoso, it was brought out that defendant admitted to being present at a ranch, where the bodies of SA Camarena and Zavala were found, and when a family at the ranch was killed.  (RT 10:158.)  These statements, however, were stricken by the Court because defendant argued they were "irrelevant."  (RT 10:158.)

17

tortured and murdered.  (RT 12:64, 16:40.)  At trial, there was forensic and trace evidence introduced that SA Camerena was interrogated in a guest house to the rear of the residence.  (RT 16:52-54.)  The trace evidence included hair found in the guest house.  Special Agent Michael Malone, with the FBI, testified that hairs found in the guest house were "a match" to known hairs of SA Camerena and co-defendant Matta in the case, as well as Rene Verdugo-Urquidez and Sergio Espino.[10]  (RT 16:125, 205-7.)

Defendant's wife, Estella Fuentes, from whom defendant was by 1990, separated, testified that in 1984, she and her husband lived in Houston, Texas, with their children.  (RT 6:112-13.)  She stated that they travelled together in Mexico in December 1984, but that defendant remained behind when she returned to Texas on January 2, 1985.  (RT 6:114-15.)  By the end of 1985, and until 1989, Fuentes had little contact with, and did not see, defendant.  (RT 15:32.)  In November 1989, Fuentes testified that she received a letter from defendant.[11]  (RT 15:36.)  In the letter, defendant said he was sorry they had not been able to reconcile.  (RT 15:33.)  He said that the DEA was following him, and conducting an investigation about him and the involvement of others in the death of SA Camerena.  (RT 15:33.)  Fuentes said that, in the letter, defendant wrote about the dates they were in Mexico, and stated them as January 23 through February 7, 1985.  (RT 15:36.)  Fuentes repeated that, in fact, she was back

---

[10]    There was no hair or other forensic testimony at trial placing defendant at Lope de Vega, La Langosta, or any other location.

[11]    Fuentes said she did not have a copy of the letter, and was testifying from memory.  (RT 15:32.)

in Houston by January 2, 1985, without defendant, for the children to go to school.  (RT 15:37.)

Special Agent Robert Castillo testified that, in September 1985, he was present for the excavation of a gravesite in Parque Primavera near Guadalajara.  (RT 14:170.)  A person who said he was a bodyguard to Caro directed law enforcement to the location.  (RT 14:170.)

**IV.**

**ARGUMENT**

Although defendant's pleading is voluminous, his argument can be stated succinctly as follows:  (1) although SA Malone did not provide direct evidence linking defendant to any crime, the testimony of SA Malone corroborated Cervantes, who linked defendant to the racketeering enterprise, which was necessary to sustain the VICAR convictions; and, (2) without the corroboration of SA Malone there was insufficient independent evidence to sustain the convictions under the Napue standard.

Important in understanding defendant's arguments are the somewhat unusual series of events that occurred in the filing of defendant's initial motion and his supplemental motion.

In 2016, in his initial motion, defendant attempted to "piggyback" on the arguments of co-defendant Matta.  The table of contents, long passages, and exhibits are the same as those filed in Matta's § 2255 motion.[12]  In his initial motion, defendant quoted from the same passage of the government's closing argument as Matta, in

---

[12]   This, of course, is not an unusual occurrence with petitioners proceeding *in propria persona*, and the government is not intending this as derogation of the arguments and pleading.  Ashelman v. Pope, 793 F.2d 1072, 1078 (9th Cir.1986) ("[W]e hold [plaintiff's] pro se pleadings to a less stringent standard than formal pleadings prepared by lawyers.").

which the government stated, "And after January, Camarena was abducted and tortured in the guest house, and Matta was there ladies and gentlemen . . . And this corroborates Cervantes when he tells you these meetings occurred." (Def. Mot., p. 43.) He then went on, as did Matta, with lengthy arguments excoriating the credibility of Cervantes.[13] In 2017, in granting Matta's motion, this Court cited this statement of the government as one of the factors in finding SA Malone's testimony material to Matta's convictions. (Ex. 8, p. 25.)

Defendant now, in his supplemental motion filed in 2018, tries to drive a truck through this passage. Over and over again he cites this as the "papal blessing" by SA Malone of Cervantes, and even the government's theory of the case as a whole. (Def. Supp. Mot., pp. 5, 15, 24, 36.)

But this is too slender a reed on which to place materiality for this defendant. It could not have been lost on the jurors that defendant was not charged with the murders of SA Camarena or Zavala. It was a point both defendant and the Court made clear at trial. It also ignores the abundant trial evidence supporting defendant's convictions, including his own statements, linking defendant to the drug enterprise and the eyewitness testimony of Plascencia at La Langosta.

---

[13] At one point, defendant apparently substituted his name for that of Matta in the following statement, "Malone's testimony was not just the centerpiece of the government's case, it was essential to establish at Vasquez's trial both that his co-defendants had actually joined the conspiracy to kidnap agent Camarena and that they participated in the kidnapping." This makes no sense in the context of defendant. For Matta, it was raising the point of when the kidnapping conspiratorial intent was formed.

1

### A.   Standard of Review

2    To prevail on a claim pursuant to <u>Napue v. Illinois</u>, 360 U.S.

3   264, 269 (1959), the petitioner must show that (1) the testimony was

4   actually false, (2) the prosecution knew or should have known that it

5   was actually false, and (3) the false testimony or evidence was

6   material.  <u>United States v. Zuno-Arce</u>, 339 F.3d 886, 889 (9th Cir.

7   2003); <u>Hayes v. Brown</u>, 399 F.3d 972, 984 (9th Cir. 2005).  As noted

8   in the introduction, as to the forensic hair testimony evidence, the

9   government does not dispute the first two of the three points, and

10  the focus, therefore, is on materiality.

11    The test for materiality in a <u>Napue</u> claim is if there is "any

12  reasonable likelihood that the false testimony could have affected

13  the judgment of the jury." <u>United States v. Agurs</u>, 427 U.S. 97, 103

14  (1976); <u>United States v. Bagley</u>, 473 U.S. 667, 679-80 (1985).  Under

15  this materiality standard, "A reasonable probability does not mean

16  that the defendant would more likely than not have received a

17  different verdict with the evidence, only that the likelihood of a

18  different result is great enough to undermine confidence in the

19  outcome of the trial." <u>Smith v. Cain</u>, 564 U.S. 73, 75 (2012),

20  citing, <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995)(internal quotation

21  marks omitted).

22    Evidence may be immaterial when it is "only a small part of the

23  mosaic of trial testimony." <u>Jones v. Ryan</u>, 691 F.3d 1093, 1104 (9th

24  Cir. 2012).  The materiality determination must be made "in the

25  context of the entire record," <u>United States v. Agurs</u>, 427 U.S. 97,

26  112 (1976), and "turns on the cumulative effect of all such evidence

27  suppressed by the government," <u>Kyles v. Whitley</u>, 514 U.S. 419, 421

28  (1995).  "[E]vidence impeaching an eyewitness may not be material if

the State's other evidence is strong enough to sustain confidence in the verdict." <u>Smith v. Cain</u>, 564 U.S. 73, 75 (2012).

In <u>Napue</u> claims, "[t]here is no rule of automatic reversal." <u>Morris v. Ylst</u>, 447 F.3d 735, 745 (9th Cir. 2011); <u>See also</u>, <u>Hall v. Director of Corrections</u>, 343 F.3d 976, 984 (9th Cir. 2003)("A new trial is not automatically required when false evidence is discovered."). Instead, where other evidence at trial demonstrates the relative unimportance of the erroneous evidence, the error is immaterial. <u>Jones v. Ryan</u>, 691 F.3d at 1104 (9th Cir. 2012). The materiality of a witness's testimony must be "evaluated in the total context of the events at trial." <u>United States v. Frady</u>, 456 U.S. 152, 169 (1982).

> **B.    The Testimony of SA Malone Was Not Material to the Charges On Which Defendant Was Convicted**

Defendant prefaces his supplemental motion with statements that "the analysis of prejudice here must not be undertaken in a hyper-technical manner," and cautions the Court that "[w]hat is lost in the transcripts is the emotionally charged atmosphere of the trial." (Def. Supp. Mot., p. 2.) General exhortations, however, cannot take the place of rigorous legal and factual analysis.

On application of the facts at trial to the law, SA Malone's hair testimony cannot be seen as material to defendant's convictions.

> **1.    <u>No Bolstering of Cervantes Was Needed or Material to Show Defendant's Connection to the Murders at La Langosta</u>**

Defendant's primary argument is that the testimony of SA Malone

was bolstering of the testimony of Cervantes.[14]  Defendant argues that

"the government would have the jury believe Cervantes across the

board – in particular, in regard to his testimony that Vasquez-

Velasco had admitted to Cervantes his participation in the killings

of the two Americans," and later characterizes this as a "direct

admission" by defendant.  (Def. Supp. Mot., p. 20.)  But that is not

what Cervantes said in his testimony.  Cervantes testified that it

was Barba who came back with blood on his clothes, not defendant.

Cervantes said defendant did not come back to La Quinta until the

next day.  When he did come, the statement that Cervantes attributed

to defendant -- properly translated -- was that the tourists "had

been stabbed with ice picks," not that defendant had done it himself.

(RT 7:38.)  Notably, in defendant's initial motion, he gets the

testimony right, recounting that the statement was that the tourists

"had been stabbed with ice picks," and not specifically that

defendant had done the killings.  (Def. Mot., p. 18.)  Similarly,

what Cervantes recounted from defendant as to the Bravo ranch, where

the bodies of SA Camerena and Zavala were found, was that "Pavon had

killed everybody in the Bravo family," not that defendant admitted

personal participation in the murders.[15]  (RT 7:51-52.)  RT 10:158.)

---

[14]  Defendant suggests, both in his motion and his supplemental
motion, that Cervantes was the only witness who could make an in-
court identification of defendant.  SA Reynoso identified defendant
from the interview with him.  (RT 10:109.) Cervantes identified
defendant.  (RT 6:181.) Defendant stipulated to his identification by
defendant's wife.  (RT 6:111.)

[15]  Defendant is in a curious position on this evidence about
defendant's statements about the killings at the Bravo ranch.  In his
motion and supplemental motion, he argues the importance of this
evidence at trial.  Yet, at trial, defendant successfully moved to
exclude statements, on relevance grounds, by defendant to SA Reynoso
that he was present at the Bravo ranch when the killings occurred.
(RT 10:158 ("He told me the date that the events took place at El

1   In this regard, the statements of defendant both to SA Reynoso
2   and Cervantes were of apiece.  In each instance, defendant seemed to
3   know a great deal, and be present for a lot, but would come just shy
4   of admitting personal responsibility.  When defendant recounted to SA
5   Reynoso what occurred at La Langosta, he had many facts, but did not
6   admit that he was personally present.  SA Reynoso, in his testimony,
7   described this characteristic as follows:  "He always fronted
8   everyone.  He wasn't anywhere.  He knew everything.  He fronted his
9   brothers on everything."  (RT 10:221.)  By the time of trial, his
10  brothers Eliseo and Antonio were both deceased.  Far more than SA
11  Malone, it is defendant's own statements that provided corroboration
12  to Cervantes.

13  Also, as to the credibility of Cervantes, defendant seems to
14  have left-off part of his argument.  Defendant argues, "Indeed, a
15  non-credible Malone served to corroborate a non-credible Cervantes."
16  (Def. Supp. Mot., p. 20.)  Defendant provided a rhetorical drum-roll
17  by stating, "As discussed at length in this brief, Cervantes was
18  impeached by official records that completely discredited him."
19  (Id.)  When defendant gets around to discussing what those official
20  records are, and how they were relevant, it was a record of non-
21  existence of telephone service at the La Quinta house prior to 1988.
22  (Id. at 34.)  Defendant argues, "This evidence discredited all of
23  Cervantes' fictional testimony about phone calls to and from La
24  Quinta, which directly implicated [defendant] in the La Langosta
25  murders and his connection to Barba."  (Id.)

26  But, as defendant studiously ignores, defendant readily admitted

27

28  Marena, where a family was killed.  He was a witness.))  In neither,
    instance, however, did defendant directly implicate himself.

24

1    going to La Quinta to socialize, working at a marijuana cultivation

2    site for the trafficking group, and said that he knew Barba, Fonseca

3    and Caro.  (RT 10:154-159.)  The evidence was abundant at trial, and

4    from many sources, that the Guadalajara Cartel existed, including

5    from law enforcements agents and former participants in the group.

6    (RT 4:22, 5:41, 91.)  "Once the existence of a conspiracy is shown,

7    the government need only prove a slight connection between the

8    defendant and the conspiracy."  United States v. Matta-Ballesteros,

9    71 F.3d 54, 765 (9th Cir. 1995).  Defendant's own statements provided

10   ample evidence of his connection to the conspiracy.

11        As to the phone documents, Lawrence Harrison testified at length

12   about the elaborate communication system he constructed for Fonseca,

13   and that Barba became a "partner" to Fonseca.  In addition to a

14   telephone at La Quinta, Cervantes testified that Fonseca had a

15   telephone in one of his cars.  (RT 8:51, 13:95.)  Harrison testified

16   that the high-frequency radio repeater system he built "was designed

17   to eliminate the need for outside antennae on the cars or the

18   houses."  (RT 13:117.)

19        As far as the government can determine, the only fact defendant

20   has raised in his brief to discredit Cervantes is the telephone

21   company record.  The government cannot determine why this record,

22   which seems of sleight value given the overall sophistication of the

23   group and that La Quinta was operating as a "safe house," would

24   result in the wholesale discredit of Cervantes.[16]

25   _____

26        [16]   Oddly absent from defendant's supplemental brief is any
     reference to the post-trial recantation by Cervantes that was the
27   centerpiece of an earlier post-trial motion by defendant.  See, CV
     No. 97-08257-JAK.  Perhaps this was an oversight, or perhaps
28   defendant did not reference it because its substance was not helpful

1   As noted above, defendant may have framed his arguments in his

2   supplemental motion in light of the Court's ruling in the Matta

3   motion.  In that order, this Court made plain that it did not believe

4   post-trial issues as to the credibility of Cervantes to be relevant

5   considerations in the current § 2255 motion.  This Court stated,

6          As noted, the question of the credibility of Cervantes
   has been repeatedly adjudicated.  It is not appropriate to

7   reconsider those issues that have previously been decided,
   or make inferences about what the jury determined regarding

8   the credibility of Cervantes based on evidence that was not
   before the jury at trial.

9
   (Ex. 8, p. 19.)  This may explain why the challenges to the testimony

10  of Cervantes are far more blurry and indirect, and on close analysis

11  less substantive, in defendant's supplemental briefing than they were

12  in his initial motion.[17]

13
       2.   **The Testimony of SA Malone Was Not Material to Finding**

14  **Defendant's Connection to the Racketeering Enterprise**
   **And the Facts at La Langosta**

15
   There are points in defendant's brief in which he untethers his

16  arguments about the material impact of SA Malone's false testimony

17  from Cervantes.  This is defendant's "papal blessing" argument, that

18  the government first built-up and "embellished" the reputation of SA

19

20  _____

21  to defendant.  The recantation is discussed in defendant's initial
   motion in this matter, and in a section defendant entitles, "The

22  Buying of Cervantes' Testimony."  (Def. Mot., pp. 19, 45.)  In the
   declaration from Cervantes, Cervantes recanted the involvement of

23  Zuno in planning meetings, stating that he had been coached, but he
   repeated his prior statements that he had worked for Barba at La

24  Quinta.  His recantation made no mention of defendant.  In denying
   the post-trial motion, and that of Zuno, the Court (the Honorable

25  Edward Rafeedie) held that Cervantes recanted from financial motives.

26      [17]    At the conclusion of defendant's motion, defendant has
   requested, if the Court declines to order a new trial, a discovery

27  hearing to examine allegations of CIA involvement in the crimes.
   (Def. Supp. Mot., p. 54.)  In the Matta order, this Court stated,

28  "Judge Rafeedie previously found that discovery into questions
   regarding the CIA at trial was not warranted.  That holding was
   affirmed."  (Ex. 8, p. 19.)

1  Malone through having him relate his training and experience, and

2  then "used Malone's direct examination to validate the theory of its

3  case across the board as to all defendants." (Def. Supp. Mot.,

4  pp. 13-14.) Defendant argues that, "In this way, Malone's false and

5  unreliable testimony implicated Vasquez-Velasco and in so doing,

6  materially prejudiced him to warrant a new trial." (Id. at 14.) The

7  argument is that by testifying about Lope de Vega, SA Malone

8  indirectly lent credence to the government's theory of the

9  Guadalajara Cartel and what occurred at La Langosta. (Id.)

10     But by no leap of logic could the hairs found in the Lope de

11  Vega guesthouse be seen as direct evidence of defendant's involvement

12  in the murders at La Langosta. The two incidents are related only in

13  as much as they can be seen as committed by the same racketeering

14  enterprise (in the indictment, "the Guadalajara Cartel), and perhaps

15  from the same motive, that is, in retaliation for the recent

16  marijuana seizures, an indirect connection. Defendant, himself,

17  admitted to participation in the Guadalajara Cartel. He said he knew

18  and socialized with Fonseca, Caro, Barba and many others. He stated

19  that he travelled to Zacatecas and helped load trucks with marijuana

20  as Mexico law enforcement officers stood by. He said that, at the

21  time of the La Langosta incident, the traffickers were upset about

22  the Chihuahua seizure. In addition, Plascencia linked defendant to

23  the Guadalajara Cartel. He stated that both he and defendant worked

24  for Espino, and that he saw defendant at Fonseca's house, in addition

25  to seeing him with Fonseca and Caro at La Langosta, and describing

26  the violent events there. Notably, neither in defendant's opening

27  statement or closing argument did he dispute defendant's association

28  with the Guadalajara Cartel.

27

Independent of defendant, Plascencia, and SA Malone there is no doubt that Walker and Radelat went missing at the end of January 1985, that their bodies were later recovered with clear indications of violent deaths, that SA Camarena and Zavala went missing on February 7, 1985, that Zavala was an informant working with SA Camarena, that Caro and Espino were tape recorded interrogating SA Camarena, and that the bodies of SA Camarena and Zavala were later recovered, also with indications of violent death.  SA Malone did not -- and could not -- provide either the basic facts as to the two sets of abductions, or the connections between them.  It came from the eyewitnesses to the facts at the time they occurred, and defendant's own statements.

The materiality of a witness's testimony must be "evaluated in the total context of the events at trial."  <u>United States v. Frady</u>, 456 U.S. 152, 169 (1982).  Defendant's attempt to use SA Malone's false testimony as a general cloak of wrongdoing over the government's case as a whole is not supported by case law.  A specific examination of the effect of the testimony must be conducted.  In this case, apart from vivid speculation, there is no showing of materiality of SA Malone's testimony to the murders of the tourists and the counts of conviction.

    **3.**    <u>Cumulatively, and in the Total Context of the Evidence at Trial Against Defendant, the Testimony of SA Malone Was Not Material to Defendant's Convictions</u>

At trial, in closing argument, what defendant focused on was the credibility of Plascencia.  What defendant argued was as follows:

> What is the bottom line in the government's charge of Walker and Radelat at La Langosta?  It's one witness: Enrique Plascencia Aguilar.  My client has been here,

1    literally, for two and a half months.  And the government
2    has put on one witness on La Langosta, and that is Mr.
     Plascencia.

3                          [ . . . ]

4        What that means, in a nutshell, is that the
     government's entire case regarding the murders of John
5    Walker and Alberto Radelat depends exclusively on Mr.
     Plascencia's testimony of what happened there.

6
7  (RT 28:184-85.)  Defendant emphasized that he was "the one defendant

   in this courtroom who has no charges regarding Camarena or Zavala."
8
   (RT 28:184.)  In defendant's closing argument, he made no mention of
9
   SA Malone.
10
        Conversely, in defendant's supplemental motion, the discussion
11
   of Plascencia occurs near the end of defendant's brief.  (Def. Supp.
12
   Mot, p. 38.)  In the discussion, defendant strains to tie Plascencia
13
   to SA Malone.  Defendant argues, "In short, Plascencia was of no
14
   value to the government's case, which highlights the significance of
15
   Cervantes' role as a pivotal witness against [defendant] and
16
   therefore heightens the prejudicial impact of Malone's misconduct in
17
   corroborating Cervantes."  (Def. Supp. Mot., p. 39.)  Defendant's
18
   argument is essentially reductive:  the only effective evidence the
19
   government had was Cervantes, who was supported by SA Malone, so
20
   without the testimony of SA Malone, then there is a "reasonable
21
   probability" the defendant would not have been convicted under Napue.
22
        At the conclusion of the evidence, the jury was read the
23
   standard instruction, "The testimony of a single witness may be
24
   sufficient to convince you beyond a reasonable doubt of the existence
25
   of an essential element of the offense charged if you believe that
26
   the witness was truthful and accurately related what in fact
27
   occurred."  (RT 31:8-9.)  Plascencia was the only witness to
28

                                    29

1   defendant going into La Langosta and, with others, beating at least

2   one of the tourists.  Defendant does not argue a third domino, that

3   Malone supported Cervantes, and Cervantes supported Plascencia.  He

4   dismisses Plascencia's testimony entirely.

5       As to why Plascencia's testimony is to be disregarded, in

6   defendant's supplemental motion he makes only the same two arguments

7   he made in 1990.  The first argument, made at different points, is

8   that it was "patently absurd" to believe that Plascencia observed the

9   goings on in La Langosta "through an opening at the front door."

10  (Def. Supp. Mot., p. 3, 39.)  In defendant's initial motion, he

11  states that Plascencia was looking through "the keyhole of the front

12  door and the "crack in the door."  (Def. Mot., p. 6.)   None of this

13  matches Plascencia's actual testimony, in which he described the La

14  Langosta entrance as "swinging doors, bar-style doors," (RT 19:61.)[18]

15  Plascencia testified that his role was as a guard to Fonseca, and

16  that defendant was a guard to Barba, both of whom were present in the

17  restaurant. (RT 19:46, 19:91-92, 28-190.)

18      Defendant's second argument, argued vigorously both before the

19  jury and in this motion, pertained to an out-of-court statement

20  introduced from Ontiveros.  (Def. Supp. Mot. pp. 39-45.)  In a

21  statement obtained in Mexico, Ontiveros first admitted his

22  participation in the murders at La Langosta, but did not state that

23  defendant or his brothers were present.  (Def. Supp. Mot., p. 40.)

24  Later, Ontiveros recanted his confession, stating that he was not

25

26  _____

27      [18]   At trial, the government introduced photographs of La
    Langosta but the appearance of the restaurant had apparently changed
    because, from the photographs, Plascencia was asked to "describe at
28  that time in '85, January, the type of front doors for the La
    Langosta restaurant."  (RT 19:61.)

                                    30

present at La Langosta.  (RT 27:38.)  The Court allowed both
statements to be received in evidence for the truth asserted.  (RT
27:38-39.)  The first of these statements, however, which defendant
read to the jury in closing argument, was of dubious value.  Although
Ontiveros did not say that defendant was present at La Langosta, his
statement also did not say that defendant was not there.
(RT 28:191.)  Ontiveros' statement affirmed much of what was said by
Plascencia, defendant in his recorded statements, and by Cervantes,
that the incident had occurred at the end of January 1985, that
Barba, Caro and Fonseca were all present, and that the tourists were
beaten because they were mistaken for DEA agents.  (RT 28:190.)  At
trial, defendant argued that, in the written statement from which he
read, "There is no mention of Javier Vasquez, there is no mention of
anybody in the Vasquez family."  (RT 29:6.)  Defendant is, of course,
correct when he states in his supplemental motion that a written
statement is not as "emotionally charged" as courtroom testimony.
(Def. Supp. Mot., p. 2.)  Perhaps that is why the reading of the
Ontiveros statements at trial seem to have had little impact on the
jury.

These two arguments did not convince the jury then; the false
hair comparison testimony of SA Malone does not lend them any greater
force now.

In addition, there was much evidence against defendant -- direct
and indirect -- of which he makes no mention in his motion and
supplemental motion.  Most obviously, as recounted above, defendant
nowhere mentions the three-hour recorded statement he gave to SA
Reynoso.  In it, defendant admitted his association with Barba,
Fonseca, Caro and others.  He admitted going to Zacatecas to assist

31

1   in the marijuana production.  He admitted detailed knowledge of the

2   murders at La Langosta, that the traffickers were angry about the

3   seizures of marijuana, including at Bufalo, and that the tourists

4   were mistaken for DEA agents and later killed.  He admitted that when

5   Fonseca was arrested he went into hiding.  In both his initial and

6   supplemental motions, defendant makes no mention of these facts.

7       Lastly, defendant makes no mention of the testimony of his

8   estranged wife, that defendant was, in fact, in Mexico at the end of

9   January 1985.  She testified about a letter in which defendant

10  attempted to create an alibi for his whereabouts at the time of the

11  murders at La Langosta.

12      All of this was part of "the mosaic of trial testimony."  <u>Jones</u>

13  <u>v. Ryan</u>, 691 F.3d 1093, 1104 (9th Cir. 2012).  As to the convictions

14  of this defendant, the false testimony of SA Malone about hair

15  obtained from the guesthouse at Lope de Vega residence did not impugn

16  the integrity of the verdicts, and was not material to the

17  convictions.

18  <b>V.</b>

19  <b><u>CONCLUSION</u></b>

20      Defendant's 28 U.S.C. § 2255 motion to vacate, correct or

21  correct sentence should be denied.