UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |


Present: The Honorable     JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |


**Proceedings:**     **(IN CHAMBERS) ORDER RE MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255 (CV DKT. 1; CR DKT. 3609) JS-6**


I. **Introduction**

On August 6, 1990, Javier-Vasquez Velasco ("Petitioner") was convicted of two counts of aiding and abetting murder in furtherance of racketeering, in violation of 18 U.S.C. § 1959. CR 3146.[1] The convictions were related to the January 30, 1985 murder of two American tourists, John Walker ("Walker") and Alberto Radelat ("Radelat"), in Guadalajara, Mexico. On May 23, 1991, Petitioner was sentenced to life imprisonment as to each conviction, with the sentences to run consecutively. CR 2871. Petitioner is currently in federal custody serving those sentences. *United States v. Javier Vasquez-Velasco*, 15 F.3d 833 (9th Cir. 1994).

The current petition was filed on November 7, 2016, following the decision of the Ninth Circuit granting Petitioner leave to file a second or successive petition under 28 U.S.C. § 2255 ("Motion"). CR 4302; CV-09685, Dkt. 2. The Motion seeks relief based on a disclosure by the Office of the Inspector General of the Federal Bureau of Investigation that the testimony at Petitioner's trial by FBI Special Agent Malone ("Malone") was unreliable. Petitioner argues that, although Malone's testimony did not directly address Petitioner, it had a material effect on Petitioner's conviction because it corroborated the testimony of Hector Cervantes-Santos ("Cervantes") who was a key witness. Petitioner also contends that the two key witnesses who provided trial testimony about him, Cervantes and Enrique Plascencia Aguilar ("Plascencia"), were not credible. He then contends that, without Malone's testimony, there was insufficient evidence to support his convictions. *See* Petitioner's Supplemental Motion ("Suppl. Motion"), CR 4349. On May 14, 2018, the government opposed the Motion ("Gov't Opp'n"). CV-9685, Dkt. 10. Petitioner filed a reply on June 1, 2018 ("Repl."). *Id.*, Dkt. 14.

---

[1] "CR" refers to the Record in *United States v. Caro-Quintero*, et al, CR 87-422-JAK. "RT" refers to the Reporter's Transcript of proceedings in Petitioner's 1988 jury trial, *United States v. Caro-Quintero*, CR 87-422-JAK, and is followed by the volume and page number. "CV" refers to the civil cases Petitioner has filed and is followed by the case number and docket entry.

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|---|---|---|---|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

A review of these filings shows that, pursuant to Local Rule 7.15, the matters can be decided without a Hearing, and are addressed in this Order. For the reasons stated in this Order, the Petition is **DENIED**.

II.  **Background**

  A.  Petitioner's Arrest and Trial

  1.  Overview

In June 1989, a Grand Jury returned a Sixth Superseding Indictment charging 19 defendants, including Petitioner, associated with the Guadalajara Narcotics Cartel ("Cartel") with committing crimes in 1984 and 1985. CR 4353-1. The first two counts charged eight persons, including Petitioner, with committing violent crimes in aid of a racketeering enterprise in violation of 18 U.S.C. § 1959. The basis for these counts were the murders of John Walker and Alberto Radelat in Guadalajara Mexico. The remaining counts of the Sixth Superseding Indictment charged various crimes arising from the kidnapping and murder in Guadalajara one week later of Drug Enforcement Administration ("DEA") Special Agent Camarena ("Camarena"). Petitioner was not charged with the counts relating to the kidnapping and murder of Camarena.

On May 15, 1990, the trial of Petitioner and three co-defendants -- Juan Ramon Matta-Ballesteros, Ruben Zuno-Arce, and Juan Jose Bernard-Ramierez -- commenced. As noted, Petitioner was charged and tried on the following two counts of the ten-count Sixth Superseding Indictment:

  Count One: Aiding, abetting, counseling, inducing, procuring, causing and otherwise willfully participating in the murder of John Walker, in furtherance of a racketeering enterprise, in violation of 18 U.S.C. § 1959

  Count Two: Aiding, abetting, counseling, inducing, procuring, causing and otherwise willfully participating in the murder of Alberto Radelat, in furtherance of a racketeering enterprise, in violation of 18 U.S.C. § 1959

District Judge Edward Rafeedie presided at the trial. At the trial, the government asserted that the murders of Walker and Radelat were in retaliation for recent DEA enforcement activities. Extensive evidence was presented as to the nature and scope of the drug trafficking operation in which Petitioner allegedly participated, and the events surrounding the murders. The government relied on four lay witnesses to link Petitioner to the murders of Walker and Radelat murders: Hector Cervantes- Santos; Enrique Plascencia-Aguilar; DEA Special Agent Abel Reynoso ("Reynoso"); and Estella Fuentes. No forensic evidence was presented as to Petitioner himself. On August 6, 1990, Petitioner was convicted on Counts One and Two.

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|---|---|---|---|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

2.      The Murders of Walker and Radelat

a)      Events Leading to the Murders of Walker and Radelat

DEA Agent James Kuykendall ("Kuykendall") testified that he was the "Resident Agent in Charge" in Guadalajara from 1982 to 1985. RT 1:106-107. At Kuykendall's direction, the DEA conducted a series of operations in Mexico in 1983 and 1984 whose purpose was to disrupt narcotics trafficking. Camarena played a significant role in these actions.

Evidence was presented at trial regarding DEA operations that resulted in seizures of substantial amounts of marijuana and related materials from the Cartel. Camarena was involved in those operations. RT 1:156. One operation took place in May 1984 and resulted in the seizure in Zacatecas, Mexico, of approximately 10 tons of marijuana, 200 liters of hash oil and 6500 pounds of marijuana seeds. RT 1:152-55. Another operation on November 8, 1984, which occurred in Chihuahua, Mexico, led to the destruction of 10,000 tons of marijuana. RT 5:35. The marijuana was worth approximately $5 billion. RT 5:81. These and other enforcement actions of the DEA during this time period resulted in substantial financial loses by the Cartel. RT 4:142. At trial, this evidence of financial loss was presented as a potential motive to abduct and murder Camarena and to show that Walker and Radelat had been murdered because members of the Cartel believed, in error, that the two were DEA agents.

In response to the DEA enforcement efforts, the Cartel engaged in a series of retaliatory actions that were directed toward DEA agents in Mexico and persons suspected of cooperating with the DEA. For example, in March 1984, cartel leader Felix-Gallardo became aware that he was being investigated by the DEA in Guadalajara and sent a warning to Kuykendall not to investigate him. RT 2:39. In September 1984, a Mexican lawyer named Cesar Garciabueno, who provided information to the DEA which resulted in a seizure of $11.7 million in U.S. currency, was shot five times in a Guadalajara bar by an individual who claimed to work for Felix-Gallardo. At the time that the assailant committed this act he allegedly stated, "You're going to die because you're a snitch." RT 5:173-75; 6:19-21.

During this same time period, leaders of the Cartel conducted meetings and began to develop a plan to kidnap Camarena. The government's primary witness regarding these meetings was Cervantes. He testified that he was in charge of security at the "safe house" owned by Javier Barba Hernandez ("Barba"), an attorney who allegedly worked with the Mexican drug traffickers. RT 6:171, 174. Barba was one of the known leaders of the Cartel, and referred to the safe house as "La Quinta." RT 7:5. Cervantes said that his duties included checking the identities of all persons who came to La Quinta to meet with Barba. RT 6:180.

The first meeting among the Cartel leaders occurred in September 1984, during a baptism reception for Barba's daughter. RT 6:175. Cervantes testified that at the meeting, those present discussed "a DEA agent who was causing trouble." RT 6:185-86. Cervantes also testified that everyone at the meeting agreed that they should seek to identify that DEA agent, and Zuno-Arce stated that the DEA Agent should be "picked up." RT 6:185-86.

In October 1984, the day of the wedding of Barba's brother, high ranking members of the Cartel held

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|---|---|---|---|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

another meeting at La Quinta. RT 7:23. During the meeting, Miguel Aldana, a Mexican police officer, showed a police file to Matta and told him that he would soon have the identity of the DEA agent who was causing so much trouble. RT 7:24. Cervantes testified that during this meeting, Aldana and Matta discussed "Zacatecas," the location of the May 1984 marijuana raid. RT 7:24. Later that same day, a second meeting was held at La Quinta. RT 7:26. Cervantes testified that Rafael Caro-Quintero ("Caro-Quintero") did a lot of speaking during the meeting, and that the central topic was again "the DEA agent who was continuing to cause trouble." RT 7:28.

The final meeting before the murders of Walker and Radelat took place in December 1984 at the residence of cartel leader Fonseca in Guadalajara. RT 6:121. There, Ernesto Fonseca-Carillo ("Fonseca") shared a photograph of Camarena with the other attendees as they planned his abduction. RT 6:120-21. One of those present, Antonio Garate ("Garate"), remarked that "they would take care of" Camarena. RT 6:135. On February 7, 1985, one week after the murders for which Petitioner was convicted, Camarena was abducted and then murdered. RT 11:12. His body was found in Zamora, Mexico on March 6, 1985. RT 12:231.

        b)       Petitioner's Involvement in the Cartel

Evidence was presented at trial in support of the government's contention that Petitioner was associated with transporting illegal narcotics into the United States in his role as a bodyguard for Barba. RT 7:29; 8:45; 19:46. Barba, Caro-Quintero, Fonseca, Matta and Miguel Angel Felix-Gallardo were some of the known leaders of the Cartel. RT 13:108-14. At trial, Cervantes and Plascencia testified that Petitioner worked as an armed bodyguard for Barba and other leaders of the Cartel, and that Petitioner was with the leaders of the Cartel on the night when Walker and Radelat were murdered.

At trial, Plascencia testified that he and Petitioner worked together at the Mexican federal I.P.S. office in Guadalajara and had the same supervisor -- Sergio Espino-Verdin ("Espino"). RT 19:45. Plascencia also worked as a bodyguard and driver for Garate, an associate of the Cartel. RT 6:120-121. Plascencia testified that he saw Petitioner working as an armed bodyguard for leaders of the Cartel on two occasions. *First*, on or about July or August of 1984, he saw Petitioner working as an armed bodyguard for Fonseca and Caro-Quintero at a funeral. RT 19:47-50. *Second*, Plascencia testified that in December 1984, when he drove Garate to Fonseca's residence, RT 6:122, he saw Petitioner inside the house working as an armed bodyguard. RT 6:125-128. Another witness, Cervantes, testified that in late 1984 he saw Petitioner working as an armed bodyguard for Barba at La Quinta on two occasions. The first was at the baptism at Barba's daughter in September, RT 6:180-182, and the second was at the wedding of Barba's brother in October. RT 7:25-26.

Cervantes also testified about two other incidents that tied Petitioner to the Cartel. *First*, Cervantes described an incident when Barba directed Petitioner and his brother to drive to Ocotlan, Mexico to transport 25 people back to La Quinta. RT 7:46-47. These people were needed to dig up five tons of marijuana in Mascota, Mexico because of "the trouble … with the gringos." *Id*. *Second*, Cervantes testified that he received a phone call from Petitioner, who was calling to inform Barba that Armando Pavon Reyes had killed everybody in the Bravo family. RT 7:51. During that call, Petitioner told Cervantes that the bodies of these victims were at La Primavera. He also told Cervantes that they

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|---|---|---|---|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

would have to be moved because Don Ruben [Zuno-Arce] owned that property, and that he would be in trouble if the bodies were found there. RT 7:52. Cervantes also testified that, after conveying this message to Barba, Barba called Petitioner and told him "that what they had done was bad" and "they should take the bodies away from there." RT 7:53.

The testimony of Cervantes and Plascencia was corroborated by Petitioner's statements to Reynoso. Reynoso testified that Petitioner admitted that he socialized with Barba at La Quinta on more than one occasion, and that he worked for Barba through his brothers. RT 10:167-168. Reynoso further testified that Petitioner told Reynoso that he went to the marijuana fields in Zacatecas with his brothers and helped load tanker trucks with marijuana. RT 10:164. Petitioner also admitted to Reynoso during their conversation that he and his brothers worked for Espino, and that he was provided official credentials. RT 10:119. Finally, Reynoso testified that Petitioner stated he knew Fonseca and had met Caro-Quintero at several social events where members of the Cartel were present. RT 10:154-159.

c)    The Murders of Walker and Radelat

On January 30, 1985, many members of the Cartel gathered at a restaurant known as "La Langosta" in Guadalajara, Mexico. RT 7:29-31, RT 19:58 *et seq*. Between 1984 and 1985, DEA conducted surveillance of La Langosta. DEA agents were instructed not to enter the restaurant. *See* RT 6:42. Agent Thomas Gomez testified that La Langosta "was a dangerous place to go. If we were found out to be DEA, we might be in danger there . . . ." RT 6:42.

The government presented testimony from Cervantes and Plascencia that Petitioner was at La Langosta on January 30, 1985. Cervantes testified that he saw Petitioner leave with Barba to meet Caro-Quintero at La Langosta. RT 7:30-31. Plascencia testified that he saw Petitioner sitting with the other bodyguards at a table inside La Langosta that was near Cartel leaders Caro-Quintero, Barba and Fonseca. Plascencia also testified that Petitioner and his brothers were armed at the time. RT 19:72.

On the same date, two male tourists, Walker, a United States citizen, and Radelat, a lawful permanent resident of the United States, entered La Langosta. RT 6:47, 86; 10:160-62; 19:85, 89-90.   Reynoso testified that Petitioner stated that when the two walked into the restaurant, the traffickers were very nervous because of the events at the end of 1984 in Chihuahua. Reynoso further testified that Petitioner mentioned that the traffickers thought that the two men were possible DEA agents. RT 10:160.

Consequentially, the Cartel members who were present, including Petitioner, grabbed the two men and began beating them. RT 19:84-85. About 10 to 15 persons then lifted the two men off the ground and carried them into a storage room in the rear of the restaurant, while continuing to strike them with their fists and guns. RT 19:86-87. Once inside the storage room, the two men were tortured until one stated that they were "police." Both were then killed. RT 10:160.

Cervantes testified that later that night Barba returned to La Quinta with Petitioner's nephew, Antonio Vasquez Ochoa ("Ochoa"). Both Barba and Ochoa had spots of blood on their clothing, boots and firearms. Cervantes testified that Barba told him, "that some gringos had been spying on them at the

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

restaurant where all the people were and that "one had died and the other one of the gringos was still alive." RT 7:34. Cervantes testified Ochoa said that "some damn gringos … they had caught them spying, and that they had beaten the shit out of them." RT 7:35.

Cervantes later testified that, on the following day, Petitioner telephoned Barba and informed him that the two victims at the restaurant had been killed with ice picks. RT 7:37-38. In June 1985, the bodies of Walker and Radelat were found in a remote section of La Primavera, outside of Guadalajara. RT 6:60-71, 96-103.

3.      Jury Verdict and Ninth Circuit Decision

As noted, on August 6, 1990, Petitioner was convicted of two counts of committing a violent crime in aid of a racketeering enterprise, in violation of 18 U.S.C. § 1959. CR 3146. On May 28, 1991, Petitioner appealed. *United States v. Vasquez-Velasco*, 15 F.3d 833 (9th Cir. 1994).

The issues raised on appeal included: (1) whether 18 U.S.C. § 1959 applies extraterritorially and, if so, whether Petitioner's conviction was supported by sufficient evidence; (2) whether Petitioner was improperly joined with his co-defendants whose crimes related to the murder of Camarena; (3) whether the district court abused its discretion when it denied Petitioner's motion to sever his trial to avoid undue prejudice; and (4) whether the district court erred in failing to use a special verdict form so that it could be determined, for sentencing purposes, whether the jury convicted Petitioner of conspiracy or participation.

The Ninth Circuit affirmed. It held that extraterritorial application of 18 U.S.C. § 1959 was appropriate because the murders of Walker and Radelat, like the murder of Camarena, were designed to advance the interests of the Cartel and its drug trafficking activities. This objective was to intimidate the DEA so that it would not continue its enforcement actions, which were adverse to the interests of the Cartel. *Vasquez-Velasco,* 15 F.3d at 841. The Ninth Circuit also concluded that there was sufficient evidence "to indicate that the murders of Walker and Radelat were in fact performed with the intention of adversely affecting DEA activities and thus promoting the cartel's drug trafficking activities." *Id.* The opinion also states that, given the facts the government was required to prove at trial, appellate review had to consider both the direct testimony as to Petitioner's participation in the murders and the broader circumstantial evidence of the events that occurred around the time of the murders. *Id.* at 842.

As to Petitioner's participation, the opinion states that Petitioner assisted in carrying Walker and Radelat to a storage room in the back of the La Langosta restaurant and aided in beating the two men. *Id.* at 838. Relying on Reynoso's direct testimony, the opinion states that the two men were tortured until one of them admitted that they were police officers. *Id.* at 843. The trial evidence showed that the two men were later killed in a field outside of Guadalajara, Mexico. *Id.* The opinion then states that Petitioner informed Barba the following day that both of the victims were dead. *Id.*

On appeal, Petitioner argued that there was insufficient evidence to support the government's retaliation theory. He referred to the absence of testimony that Walker and Radelat were murdered because they were mistaken for DEA agents. *Id.* The Ninth Circuit rejected this argument by focusing

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|---|---|---|---|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

on the circumstantial evidence presented at trial:

> At the time the murders took place the cartel was suffering from serious economic setbacks. Cartel members had identified the DEA as responsible for their losses and had already planned to "pick up" agent Camarena. They were aware that they were being followed by DEA agents and had actively threatened some who came too close. In this context, it is wholly reasonable to believe that when fifteen cartel members beat and killed two American tourists who were caught "spying" on them, they did so in the belief that the tourists were DEA agents. The fact that Camarena was captured, tortured and murdered one week later only strengthens the government's case by suggesting a pattern of retaliatory activity by the cartel.

*Id*. at 843.

With respect to Petitioner's challenge based on the single trial, the Ninth Circuit affirmed the district court's denial of Petitioner's severance motions. The opinion states that the district court "carefully instructed the jury" as to evidence that could not be used against Petitioner and instructed the jury "not [to] be swayed by their emotions. *Id*. at 846. The opinion added that the murders for which Petitioner was charged and those for which Petitioner's co-defendants were charged "were separate incidents that occurred approximately a week apart," and therefore "were discrete acts that a jury could compartmentalize reasonably easily." *Id*. For these reasons, the Ninth Circuit rejected Petitioner's argument that the jury would have been prejudiced against Petitioner by inferring that he was guilty of the two murders with which he was charged due to the murder of Camarena by others. *Id*.

B.    Procedural History

Following the Ninth Circuit's decision, Petitioner filed several appeals and motions for reconsideration. Each of these motions related to a declaration Cervantes signed on July 1, 1997, in which he recanted his trial testimony. In that declaration, Cervantes stated that he presented false testimony at trial and that he was directed to do so by the case agent and one of the prosecutors. *See* CV-08257-JAK, Dkt. 1, Pg. 8. His declaration also stated the government promised to pay him $200,000 upon the completion of the related trials. *Id*.

On November 10, 1997, Petitioner filed his first motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. CR 2184; CV-08257-JAK, Dkt. 1. There, Petitioner argued that Cervantes' recantation of his trial testimony was newly-discovered evidence that warranted relief under § 2255. *Id*. District Judge Rafeedie addressed the same issue in the context of a parallel claim by Petitioner's co-defendant Zuno-Arce. *See United States v. Zuno-Arce*, 25 F.Supp.2d 1087 (C.D. Cal. 1998). In *Zuno-Arce*, after an extensive evidentiary hearing, the district court concluded that Cervantes recanted his testimony solely for personal gain, and not because his testimony was in fact false. *Id*. Applying the *Zuno-Arce* findings to Petitioner, the district court denied Petitioner's motion on February 23, 1999, finding Petitioner failed to introduce any new evidence that would warrant findings different that those in *Zuno-Arce*. CR 2365.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|---|---|---|---|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

On April 8, 1999, Petitioner filed a notice of appeal and a petition for certificate of appealability of the denial of his § 2255 motion. CR 2369. On April 19, 2000, the district court denied Petitioner's motion for a certificate of appealability because Petitioner could not demonstrate that the government withheld exculpatory evidence or knowingly introduced false testimony at trial. *See* CV-08257-JAK, Dkt. 26-5. On May 9, 2001, the Ninth Circuit denied Petitioner's request for a certificate of appealability as to that order. *Id.*, Dkt. 26-6. On August 23, 2001, the Ninth Circuit also denied Petitioner's application for authorization to file a second of successive § 2255 motion. *Id.*, Dkt. 26-7.

On April 9, 2014, Petitioner filed a motion for fraud upon the court pursuant to *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944). CR 2475; CV-08257, Dkt. 17. There, Petitioner argued that Cervantes was "the only person to place the Petitioner in this 'crime'" and Cervantes has recanted his testimony from trial after the fact. *Id.* Petitioner maintained that the "fraud on this matter" was obvious because Cervantes was a key witness who retracted nearly every statement he made at trial and the jury did not have this information to determine Cervantes' credibility. *Id.* On November 24, 2014, the district court denied this motion, finding that it raised the same claims presented in Petitioner's original § 2255 motion. Therefore, it constituted a second, successive § 2255 motion that Petitioner had not been authorized to file. CV-08257, Dkt. 34.

On November 7, 2016, Petitioner filed a second or successive motion to vacate, set aside or correct his sentence pursuant to 18 U.S.C. § 2255. *See* CV-09685-JAK, Dkt. 1. On November 25, 2016, Petitioner sought permission from the Ninth Circuit to file this motion. CR 4302-1. As mentioned, this petition is based on the improper trial testimony of Malone.

On February 16, 2018, the Ninth Circuit granted Petitioner's request and ordered Petitioner's motion be deemed filed in the district court on November 7, 2016. CR 4302. On April 16, 2018, Petitioner filed a supplemental motion to vacate, set aside or correct his sentence pursuant to § 2255. CR 4349. The government filed an opposition to Petitioner's motion and Petitioner replied. CR 4353; 4359.

        C.      July 2014 Report of the Office of the Inspector General

Monique Perez Roth, an attorney with the United States Department of Justice, sent a letter to Petitioner that is dated November 26, 2014. CR 3612-1, Exhibit A. It states that the credibility of Malone had been called into question by a July 2014 report issued by the Office of Inspector General ("OIG") for the Department of Justice ("DOJ") called *An Assessment of the 1996 Department of Justice Task Force Review of the FBI Laboratory* (2014 OIG Report). The referenced Task Force was formed to manage "the identification, review, and follow-up of cases involving the use of unreliable analysis and overstated testimony by FBI Lab examiners in criminal cases. 2014 OIG Report at 1, 4. The Task Force was also to determine whether any irregularities in the FBI Lab "gave rise to any constitutionally required disclosures in specific prosecuted cases," and to inform the government so that such disclosures could be made. *Id.* at 4.

As part of the review conducted by the Task Force, the FBI hired scientists to assess the work performed by certain FBI examiners in 312 selected cases. *See id.* at 22. They included 162 cases in which hair and fiber analyses were performed by Malone. *Id.* The independent review identified

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-09685 JAK
LA CR87-00422 JAK (12) | Date | March 25, 2019 |
| Title | Javier Vasquez-Velasco v. United States of America
United States of America v. Javier Vasquez-Velasco | | |

"egregious errors" in Malone's analyses. *Id*. at 30. They included the following:

(1) Malone repeatedly testified that (a) by using microscopic analysis he could match an unknown hair to a known hair, and (b) the probability of the unknown hair belonging to somebody other than the known hair's contributor was one in 5,000. These claims were found to lack a scientific basis. *Id*. at 48, 53.

(2) Malone's notes regarding his examinations were often inadequate or unreadable, making it impossible to verify his results. *Id*. at 50. The notes that were legible generally were inadequate to support his testimony. *Id*. at 49. The reviewers found that "Malone's testimony was consistently overstated," and was "misleading and inaccurate." *Id*.

(3) Malone repeatedly testified that he had personally done tests and examinations, but no exhibits were presented that reflected or constituted such tests. *Id*. at 51.

(4) Malone repeatedly testified that "at least 15 characteristics are needed for a hair comparison." *Id*. at 51-52. This claim lacked scientific support. *Id*.

(5) As to fiber analysis, the reviewers wrote that "they did not believe Malone understood the appropriate use and limitations of an instrument known as a microspectrophotometer, and therefore, that he often reached scientifically inaccurate conclusions in his reports and testimony." *Id*. at 49. Thus, Malone sometimes testified -- including in the instant case -- that he could use the microspectrophotometer to identify a specific dye that was used to color a fiber. *Id*. at 50. However, the device only allows the determination of the fiber's color, not the specific dye used. *Id*.

Based on these findings, the 2014 OIG Report concluded that Malone had "repeatedly created scientifically unsupportable lab reports and provided false, misleading, or inaccurate testimony at criminal trials." *Id*. at 7, 45. The Report also found that it was reasonable to conclude that the DOJ should have known about these problems, and that they should have been addressed at an earlier date. As the 2014 OIG Report explained:

We believe the [DOJ] should have directed the Task Force . . . to review all cases Malone handled at any point during his tenure in the FBI Lab beginning in 1975, whether as a primary, secondary, or confirming examiner, where the evidence was deemed material to the defendant's conviction. A discussion about potential scope expansion should have occurred no later than fall 1999, since the FBI and the Department learned in May and July 1999, respectively, after the glaring findings by the independent scientists [hired by the FBI], that Malone's forensic analysis and testimony were unreliable.

*Id*. at 72.

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|---|---|---|---|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

      D.     *Matta-Ballesteros v. United States* and *Verdugo-Urquidez v. United States* Orders

In support of his petition, Petitioner relies primarily on this Court's decisions in *Rene Martin Verdugo-Urquidez v. United States*, No. 2:15-cv-09274-JAK (C.D. Cal. May 22, 2017) and *Juan Matta-Ballesteros v. United States*, No. 2:16-cv-02596-JAK (C.D. Cal. May 22, 2017). Petitioner, Rene Martin Verdugo-Urquidez ("Verdugo") and Juan Ramon Matta-Ballesteros's ("Matta") were convicted for crimes related to their involvement in the Cartel. *See United States v. Caro-Quintero, et al*, 2:87-cr-0422-JAK. Petitioner and Matta were co-defendants at trial. Verdugo was convicted in a trial that concluded two years earlier. All three received a letter from the DOJ regarding Malone's false forensic testimony.

In an October 2014 letter, DOJ Special Counsel Norman Wong advised counsel for Verdugo that the DOJ had recently reviewed Malone's testimony in Verdugo's trial, and, based on that review, the DOJ repudiated the hair testimony that placed Verdugo and Camarena at the crime scene (the "Wong Letter"). *See* CV-09596-JAK, Dkt. 2, Pg. 40. The Wong Letter explained that the DOJ found two types of errors in Malone's work that was related to Verdugo's case:

      1. "[Malone] stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others. This type of testimony exceeds the limits of science."

      2. "[Malone] assigned to the positive association a statistical weight or probability or provided a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to microscopic hair association. This type of testimony exceeds the limits of science."

*Id*. at 40-41.

The letter then stated that could Verdugo seek post-conviction relief under 28 U.S.C. § 2255, and that the United States waived all procedural-default defenses to permit the resolution of legal claims arising from the erroneous presentation of microscopic hair examination laboratory reports or testimony. *Id.*

In the *United States v. Caro-Quintero* line of cases, the DOJ has only reviewed Malone's testimony in the Verdugo matter. Nonetheless, in Matta's motion under § 2255, he argued that, because the DOJ acknowledged that Malone's testimony in Verdugo's trial was inaccurate or misleading, "the DOJ has, effectively, repudiated Malone's testimony" in Matta's trial. Here, Petitioner presents the same argument. Thus, he contends that the DOJ's findings and positions with respect to Verdugo's case should apply to Petitioner's case. *See* CV-09685-JAK, Dkt. 1, Pg. 14.

Based on the 2014 OIG Report and the Wong Letter, Matta and Verdugo filed successive motions to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. In both cases, Matta and Verdugo challenged their convictions related to the kidnapping and murder of Camarena. Malone's forensic testimony was utilized to place Matta and Verdugo at the crime scene Lope de Vega, at the time

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|---|---|---|---|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

Camarena was kidnapped and tortured. The government opposed both petitions, arguing that Malone's testimony was not material to the outcome of the trial.

On May 22, 2017, this Court granted both motions for new trials as to each conviction because each was materially affected by Malone's false testimony. The Court found that Malone's testimony was material to the convictions of Matta and Verdugo because there was a "reasonable likelihood that the false testimony could have affected the judgment of the jury." This determination was also supported by the showing that Malone's false testimony placed Matta and Verdugo at Lope de Vega at the time of the events that led to the torture and murder of Camarena.

Petitioner argues that the "prejudicial taint caused by Malone's misconduct to defendants Matta and Verdugo applies equally" to Petitioner. *See* Suppl. Motion, Pg. 1. Therefore, Petitioner maintains the outcome should be the same and his convictions should be vacated, and a new trial ordered. For the reasons stated below, Malone's testimony was not material to Petitioner's convictions. Petitioner was not charged or convicted of the crimes related to the kidnapping and murder of Camarena. Rather, Petitioner's convictions relate solely to the murders of Walker and Radelat. Unlike in *Matta* and *Verdugo*, Malone's forensic testimony was not used to place Petitioner at the crime scene. Nor did Malone mention the name of Petitioner or the crimes for which he was charged and convicted. No forensic evidence was gathered or analyzed with respect to the murders of Walker and Radelat, which occurred at a different location from where Camarena was murdered.

## III.    Analysis

### A.    Legal Standards

To prevail on a motion to vacate a conviction due to the presentation of false evidence by the government, a petitioner is required to show all of the following: (1) the testimony was actually false; (2) the prosecution knew or should have known that it was actually false when it was presented at trial; and (3) the false testimony or evidence was material to the conviction. *Napue v. Illinois,* 360 U.S. 264, 269 (1959); *see also Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005).[2]

In a *Napue* analysis, evidence is deemed material if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *United States v. Bagley*, 473 U.S. 667, 679-80 (1985). "[I]f it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic." *Hayes*, 399 F.3d at 978. *Napue* does not, however, create a "per se rule of reversal" when false testimony is knowingly introduced. *Id*. at 984. Instead, it is necessary to determine whether that testimony was material to the determination by a jury. The question is not "whether the defendant would more likely than not have received a different verdict" if the false testimony had not been presented, but whether the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Jones v. Ryan*,

---

[2] The government concedes that the testimony at issue was false, and that this should have been known to the government at the time of the trial. Therefore, the only disputed issue is whether the evidence as to forensic hair analysis was material to Petitioner's conviction.

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|---|---|---|---|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

691 F.3d 1093, 1102 (9th Cir. 2012). Because the determination of this question depends upon the effect of the disputed evidence on the jury, materiality is to "be evaluated in the total context of the events at trial." *United States v. Frady*, 456 U.S. 152, 169 (1982).

B.      Application

1.      Petitioner's Convictions

As noted, Petitioner was convicted on two counts: Count One, being a principal in and aiding and abetting the murder of John Walker in support of an enterprise engaged in racketeering, in violation of 18 U.S.C. § 1959; and Count Two, being a principal in and aiding and abetting the murder of Alberto Radelat in support of an enterprise engaged in racketeering, in violation of 18 U.S.C. § 1959. Petitioner was not tried or convicted on any other counts in the Sixth Superseding Indictment, which include those concerning the kidnapping and murder of Camarena.

With respect to both counts, the jury was instructed that "the following essential elements must be established beyond a reasonable doubt":

(1) the existence of an enterprise engaged in racketeering activity; (2) the activities of the enterprise affected interstate or foreign commerce;[3] (3) the defendant acted with the purpose to gain entrance to or maintain or increase position in the enterprise; and (4) that there is unanimous agreement among the jurors that defendant engaged in at least one of the following types of conduct:

(a) participated in the commission of the violent acts as charged;
(b) aided and abetted in the commission of the violent acts as charged; or
(c) conspired in the commission of the violent acts as charged.

CR 2706.

2.      Unchallenged Evidence Supporting Conviction

At trial, the government introduced three principal categories of evidence in seeking to show that Petitioner was linked to the Cartel and that he participated in the murders of Walker and Raledat. *First*, Petitioner worked as an armed bodyguard for leaders of the Cartel and participated in its trafficking activities. *Second*, Petitioner was present at the La Langosta restaurant and took part in the beating of Walker and Radelat on the night of the murders. *Third*, the murders of Walker and Radelat were part of the retaliation by the Cartel against DEA enforcement actions between 1983 to 1985 and were designed to discourage future ones. Malone's testimony was not applied to Petitioner as part of the evidence presented in any of these categories.

---

[3]  The existence of the Cartel and its effect on interstate commerce are undisputed. Therefore, this Order will only address whether Petitioner acted with the purpose to maintain his position as a bodyguard in the cartel and whether Petitioner participated in the murders of Walker and Radelat at La Langosta.

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

a.   Lack of Relevance of Malone's Forensic Evidence as to Petitioner

Petitioner asserts that Malone's false testimony served as "Papal" blessing to the government's retaliation theory. He also contends that it bolstered the credibility of Cervantes, whose testimony was introduced as direct and indirect evidence in support of the first two categories of evidence discussed above. In this regard, Petitioner contends that Cervantes was a critical witness as to the claims brought against Petitioner. Petitioner claims that ,without Malone's testimony, there would not have been adequate corroboration of the testimony of Cervantes, particularly as to the retaliation theory. *See* Suppl. Motion, Pg. 5.

At trial, Malone's testimony was offered primarily as to the actions of those defendants charged with respect to the conduct that led to the death of Camarena. Petitioner was not among those so charged. Malone testified extensively about the microscopic hair examination the FBI used to determine whether a hair whose origin was unknown was forcibly removed, cut off or shed naturally. *See* RT 16:114. After explaining his findings with respect to the hairs collected at Lope de Vega, he testified that he identified hairs in the guest house there that matched the hair of Camarena. RT 16:125. Malone also testified that he found other hairs in the guest house that matched the hair of Matta, Espino and Verdugo. RT 16:205-208. Malone presented a diagram of the guest house, which included names of all three men placed in the area of the guest house near the location where Camarena's hair was found. *See* 6/19/90 RT at 135, 149, 201, 215.

At trial, Malone's conclusion "was that Camarena was at the Lope de Vega house and particularly in the guest house… and Camarena had hair forcibly removed from him in the guest house." RT 28:123-127. The government devoted a substantial amount of time in its closing argument addressing Malone's qualifications. In its rebuttal closing argument, the government highlighted the value of Malone's testimony and his credibility, "Mr. Malone has been around the block… he knows what he's doing – he's an expert in this area. I submit to you, you should believe him." RT 30:164.

The government also used Malone's testimony to corroborate Cervantes' testimony about the meetings where the Cartel conspired to abduct Camarena. In its rebuttal closing argument, the government stated that, "after January, Camarena was abducted and tortured in the guest house, and Matta was there… *this corroborates Cervantes when he tells you these meetings occurred*." RT 30A-58 (emphasis added). Relying on this statement, Petitioner argues that the government "drew on the bank account of Malone's credibility to bolster Cervantes' credibility." *See* Suppl. Motion, Pg. 20. The government contends that this statement addressed Matta's conspiratorial intent, not Petitioner's participation in the activities of the Cartel. *See* Gov't Opp'n., Pg. 20, fn. 13.

b.   Unchallenged Evidence Supporting Convictions

Extensive evidence was presented at trial about Petitioner's involvement in the narcotics trafficking activities of the Cartel. This included Petitioner's own statements in a three-hour recorded conversation with Reynoso, which occurred after Petitioner was advised of his *Miranda* rights.
In July and August of 1989, Petitioner agreed to be interviewed by Reynoso and provided information

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|----------|----------------------------------------------|------|----------------|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

about the La Langosta murders. RT 10:113. Reynoso testified that Petitioner admitted he went to the marijuana plantations in Zacatecas with his brothers and helped load tanker trucks with marijuana. RT 10:164. Petitioner also admitted he had met Fonseca several times at social events and that he had been to Barba's residence several times. RT 10:154. He also admitted he had met Caro-Quintero. RT 10:159. This direct evidence is sufficient to establish Petitioner's association with the Cartel and his participation in its drug trafficking activities.

To address where Petitioner fit "in the big picture," in its closing argument, the government stated that, "it's important that [Petitioner was] a bodyguard in this cartel, this enterprise, because it shows his association with other people that are involved in criminal activity." RT 30A:7. The government further argued that the "enterprise had many leaders, it had many bodyguards, and none of this could have happened, none of this was possible without the assistance and protection of law enforcement officials in the Republic of Mexico." RT 28:59-60. Petitioner's statements that he was given law enforcement credentials by Espino, supports the claim that Petitioner worked as a bodyguard for the Cartel. RT 10:156. Similarly, the testimony of Plascencia that he and Petitioner worked for Espino and that he saw Petitioner at the December 1984 meeting at Fonseca's house, also linked Petitioner to the Cartel. RT 6:122; 19:45. Finally, Petitioner told Reynoso that he went into hiding after the arrest of Fonseca. RT 10:126. This is circumstantial evidence of Petitioner's ties to the Cartel and admission of responsibility for the charged offenses.

In the cross-examination of Reynoso, Petitioner's counsel implicitly asserted that Petitioner's statements to Reynoso were not admissions of guilt, but the sharing of information Petitioner obtained from his brothers. RT 10:183. At trial, Petitioner's counsel asserted that the information Petitioner conveyed to Reynoso was based on what others had told Petitioner about the events at La Langosta. Thus, Petitioner's counsel qualified Petitioner's statements about the basis for his knowledge by referring to what "they said" and that "it was said." *Id*. In rebuttal testimony, Reynoso stated that Petitioner "always fronted everyone, he wasn't anywhere, he knew everything, he fronted his brothers on everything." RT 10:221. In its closing argument, the government stated that Petitioner's statements implied his participation in the murders because Petitioner "owns up to so much detail that only a man who was present at those events would be able to see what he did" RT 30A:15.

Cervantes' testimony also linked Petitioner to the Cartel. Cervantes testified that he saw Petitioner working as an armed bodyguard for Barba in September 1984 at the baptism of Barba's daughter. RT 6:180-182. He provided the same statement as to Petitioner's presence at the October 1984 wedding of Barba's brother. RT 7:25-26. Evidence was presented that at both events, leaders of the Cartel conspired to abduct Camarena. Petitioner's attendance at these events supports the inference that he had knowledge of the DEA enforcement activities and the plans of the Cartel to retaliate. This inference is also supported by Petitioner's own statement to Reynoso that when the two Americans walked into La Langosta "the traffickers … were very nervous because of the event that had taken place at the end of 1984 in Chihuahua" and that the traffickers mistook Walker and Radelat as possible DEA agents. RT 10:160.

Cervantes also testified about an incident when Barba directed Petitioner and his brother to drive to Ocotlan, Mexico to transport 25 people from there to La Quinta. RT 7:46-47. This is evidence of

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|----------|----------------------------------------------|------|----------------|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

Petitioner's involvement in drug trafficking activities of the Cartel. Finally, Cervantes testified about a phone call from Petitioner at La Quinta, in which Petitioner told Cervantes to inform Barba that the Bravo family had been killed. RT 7:51. During that call, Petitioner told Cervantes that the bodies were at La Primavera and that they would have to be moved because that property was owned by co-defendant Zuno-Arce. RT 7:52. Cervantes then testified that, after conveying this message to Barba, Barba called Petitioner and told him that "they should take the bodies away from there." RT 7:53. This supports the inference that Petitioner took part in violent crimes on behalf, and at the direction of leaders of the Cartel. This evidence also linked Petitioner to the Walker-Radelat murders because their bodies were also found at La Primavera.

Petitioner claims that Cervantes' testimony regarding the phone call was not credible. During Petitioner's closing argument, his counsel presented official Mexican phone records, which showed that, until March 1988, there was no phone service where La Quinta was located. RT 29:44-45. In response, the government presented testimony by Lawrence Harrison ("Harrison"). He testified that he built a radio system for Fonseca that operated on Mexico government frequencies "designed to eliminate the need for outside antennas on the cars or the houses, so as to elude detection." RT 13:95. The system had four signal repeaters around Guadalajara and at least 50 radios. *Id*. Harrison also testified that he knew Espino and Barba, and that Barba became Fonseca's partner. RT 13:117. This evidence may have raised questions about the accuracy of the testimony by Cervantes about overhearing a particular phone conversation. However, even accepting that premise, Harrison's testimony was not sufficient to undermine all of the testimony of Cervantes. As noted, this included his percipient knowledge about the role of Petitioner with the Cartel. The testimony was based in part on what Cervantes observed while working for Barba at La Quinta. Moreover, Harrison's testimony provides strong support of the other evidence that there was a form of "phone" service at La Quinta.

Evidence at trial also supported the conclusion that Petitioner participated in the murders of Walker and Radelat at La Langosta. Petitioner told Reynoso that he was not present at La Langosta when Walker and Radelat were attacked. RT 10:160. Nonetheless, the government urges that Petitioner "owns up to so much detail that only a man who was present at those events would be able to see what he did" RT 30A:15. In his conversation with Reynoso, Petitioner stated that he heard from his brother and other sources that "two Americans went into [La Langosta]" and they were tortured and beaten and eventually taken out to a field a few miles outside of Guadalajara where they were killed RT 10:160-161. Petitioner also stated that, when the two Americans walked into La Langosta, "the traffickers … were very nervous because of the event that had taken place at the end of 1984 in Chihuahua" and that the traffickers incorrectly thought that the two men were likely DEA agents. RT 10:160.

Reynoso testified about Petitioner's statements regarding the La Langosta murders:

> Q: Did Defendant Vasquez indicate to you whether or not two Americans had been questioned or interrogated at the restaurant?
> A: Yes, he did say that. He said that they were questioned—Mr. Vasquez told me that the main question they asked was they wanted to know if they were police officers or policemen?
> Q: Did he indicate what the Americans responded?

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|---|---|---|---|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

A: Yes, He – In Spanish, obviously, he mimicked
Q: What did he say?
A: He said, I believe, that after the two individuals were tortured, one of them finally gave in and admitted to – Yes, Yes, I am a policeman
Q: Did he indicate whether or not initially, however, the two Americans denied being policemen?
A: Yes. He did say that at first, obviously, they didn't say anything. And eventually, they were tortured.
Q: Did Defendant Vasquez indicate to you why the two Americans first said no, they were not police officers and then later said they were?
A: He inferred because of the torture. That's what happened after all the torture took place; they finally gave in because they were afraid – They were told, you know, tell us and we won't hurt you

RT 10:161-162.

Reynoso also testified that Petitioner stated that Ezequiel Godinez, who was known as "El Primo," actually killed Walker and Radelat. RT 10:163. Petitioner admitted that he knew Ezequiel Godinez very well. RT 10:157. Reynoso's testimony shows Petitioner had substantial knowledge about the events at La Langosta.

Reynoso's testimony about Petitioner's statements was corroborated by the testimony of Cervantes and Plascencia. In its opening statement, the government described Petitioner's alleged participation in the events at La Langosta:

> [L]adies and gentlemen, from an eye witness, that in January of 1985, Javier Vasquez departed from Barba's house with a number of other people, including Barba himself, for the La Langosta restaurant in Guadalajara. And you'll hear from an eye witness that at that restaurant Javier Vasquez beat and killed John Walker as they attempted to leave and as they were being dragged to the rear of the restaurant. For these crimes, Javier Vasquez has been charged with two counts of violent crimes in aid of racketeering, one in relation to the murder of John Walker and one in relation to the murder of Alberto Radelat.

RT 1:52-53.[4]

The primary witness regarding the events at La Langosta was Plascencia. He testified that he was outside La Langosta when Walker and Radelat were taken captive. He testified that he was with six other IPS agents, including his superior Luis Gonzales Ontiveros ("Ontiveros"), at La Langosta on

---

[4] In the government's opening statement, it claimed that Petitioner killed Walker inside the restaurant. The evidence does not support this contention. Rather, the evidence shows Walker was killed by Ezequiel Godinez in the field where Walker's body was found. Notwithstanding this disparity, it is not material to the matters at issue here.

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | <mark>LA CV16-09685 JAK</mark><br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

January 30, 1985. RT 19:60. Plascencia was familiar with the layout of La Langosta because he had been there "[f]our or five times" prior. RT 19:66. That night, he and his colleagues entered the restaurant upon an invitation from Caro-Quintero, who was seated inside. RT 19:61. His group departed at approximately 7:00 or 7:30 p.m. RT 19:79-80. Plascencia testified that, while inside, he witnessed Petitioner at La Langosta seated with the other bodyguards. RT 19:75. Upon leaving La Langosta, the group entered a van that they had parked near the front of the restaurant. RT 19:79-80.

Plascencia explained that he "saw two people were coming, of American background" and that from his position in the van, he was able to see the two Americans enter the restaurant. *Id*. Cervantes testified that he saw Petitioner leave with Barba to meet Caro-Quintero at La Langosta. RT 7:30-31. This testimony is circumstantial evidence of Petitioner's presence at La Langosta on the night of the murders. It also corroborated Plascencia's testimony, and rebutted Petitioner's claim that he was not at the restaurant at the time of the events that led to the murders.

Petitioner claims that Plascencia's testimony about the events at La Langosta is not credible. Thus, Petitioner argues that it was absurd to believe that Plascencia observed the events inside La Langosta "through the keyhole of the front door." CV-09596, Dkt. 2, Pg. 6. The government responds that this misstates the record. (Opp. Pg. 30). A review of the relevant trial record supports the government's position. At trial, Plascencia was asked to describe the front doors of La Langosta restaurant. RT 19:61. He replied, "there were some swinging doors, bar-style doors." *Id*. Plascencia then described what happened after Walker and Radelat entered the restaurant:

> Q: From your position inside the van, were you able to see these two men enter the restaurant?
> A: Yes.
> Q: Now what, if anything, happens after this?
> A: As we were about to pull away from the place where we were at, we almost instinctively turned toward the door at the La Langosta restaurant.
> Q: What do you see?
> A: We saw that one of the persons who was coming out, of the two that had gone into the restaurant, was like falling. He disappeared from the doorway.
> …
> Q: After you see this, what happens next or what do you do next?
> A: Luis Gonzales [Ontiveros] made fun of that person, and made a comment saying that that jerk had fallen.
> Q: Thereafter, do you ever get out of the van again?
> A: Yes.
> Q: Do the rest of your colleagues get out of the van?
> A: Yes. Luis Gonzales [Ontiveros] told them to.
> Q: What happens next?
> A: We went to the door and Luis Gonzales [Ontiveros] opened it to see what could be seen inside.
> Q: When he pushed the door open, are you able to see inside the restaurant?
> A: Yes

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|----------|---------------------------------------------|------|----------------|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

Q: And when you looked inside the restaurant, was anything obstructing your view?
A: No.
Q: Now, tell us what you see inside the restaurant…?
A: Well, we saw that these two persons who had just entered were being beaten.

RT 19:84-85.

Petitioner also sought to impeach Plascencia with respect to his testimony about Luis Gonzalez Ontiveros ("Ontiveros"). Plascencia testified that Ontiveros was the leader of the group with whom Plascencia traveled to La Langosta on January 30, 1985. RT 19:59. Plascencia testified that while the two victims were beaten, Ontiveros stood in the doorway and was only an observer. RT 19:105-106. On cross-examination, Petitioner's counsel introduced two exhibits to impeach this testimony. Exhibit P pertained to an out-of-court statement from Otiveros, in which he admitted to participating in the murders at La Langosta, transporting the bodies, and being present during the time the bodies were buried. RT 27:38. Ontiveros later recanted this statement. *Id*. The reliability of Plascencia was vital to the government's case because he was the only witness who provided direct evidence as to Petitioner's participation in the two murders. In his closing, Petitioner's counsel emphasized that the government's case regarding the murders of Walker and Radelat depended "exclusively on Mr. Plascencia's testimony of what happened there." RT 28:184-185.

At trial, Judge Rafeedie permitted the admission of Exhibit P pursuant to Fed. R. Evid. 804(b)(3), stating that it was "relevant to the defense because it directly contradicts the statements of Plascencia-Aguilar, the government's only testifying witness to the Walker-Radelat murders." RT 26:5-10, 14. Judge Rafeedie also admitted Ontiveros recantation, finding "it should be placed before the jury to mitigate plaintiff's inability to cross-examine" Ontiveros. RT 27:40. In the closing argument, Petitioner's counsel stated that, given the contradictory statements by Ontiveros, Plascencia "as a witness, [is] not credible in anyway whatsoever." RT 29:7. Here, Petitioner argues that this impeachment of Plascencia "drove a stake in the heart of the government's case" making Cervantes' testimony central to whether his convictions should stand.

Petitioner contends that the government used Malone's testimony to validate its theory that Walker, Radelat and Camarena were murdered in retaliation for the enforcement actions of the DEA *See* Supp. Motion, Pg. 14. Petitioner claims that the government's retaliation theory hinged on establishing that Camarena had been tortured at Lope de Vega and Malone provided such testimony. *Id*. However, trial evidence apart from Malone's testimony was sufficient to support the government's retaliatory theory.[5] Kuykendall testified extensively about the DEA's enforcement actions during that time, as well as the contemporaneous financial downturn of the Cartel. RT 1:152-156. Petitioner's statements to Reynoso showed that he was aware of the seizures of marijuana in Chihuahua in May 1984, and that the Cartel leaders believed Walker and Radelat were DEA agents at the time of the La Langosta incident. RT

---

[5] The Ninth Circuit held there was sufficient evidence to support the retaliation theory, because "it is wholly reasonable to believe that when fifteen cartel members beat and killed two American tourists who were caught 'spying' on them, they did so in the belief that the tourists were DEA agents." *United States v. Vasquez-Velasco*, 15 F.3d 833, 843 (9th Cir. 1994).

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|---|---|---|---|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

10:160. This is circumstantial evidence that Walker and Radelat were beaten and murdered because they were mistaken for DEA agents.

Cervantes and Plascencia also testified that Petitioner worked as an armed bodyguard at three meetings where Cartel members discussed Camarena's abduction. RT 6:180; 7:25-26; 19:47-50. This evidence is significant. It ties Petitioner to the September, October and December 1984 meetings, where Cartel leaders discussed the effect of the actions of the DEA as well as abducting Camarena. RT 6:120-135; 6:175-86; 7:23-28. Cervantes' testimony about the statements of Barba and Ochoa, in which they described the events at La Langosta, implies that Walker and Radelat were killed because they were "gringos" who "had been spying on them at the restaurant." RT 7:34-35.

The government also presented testimony by Petitioner's wife, Estella Fuentes ("Fuentes"). It was circumstantial evidence adverse to Petitioner. At the time of the trial, Fuentes and Petitioner were married, but had been separated for ten years. RT 6:113. Fuentes testified that she traveled with their children to visit Petitioner in Mexico on December 21, 1984, and returned January 2, 1985, because their children had to return to school. RT 6:116; RT 15:37. In an attempt to restore their marital relationship, Petitioner lived with Fuentes in Houston from April to December 1985. RT 15:12. From the end of 1985 through 1989, Fuentes had little contact with, and did not see, Petitioner. RT 15:32.

The parties stipulated that, by November 1989, there were irreconcilable differences between Petitioner and Fuentes as to their marital relationship. RT 15:18. Fuentes testified that, in November 1989, she received a letter from Petitioner, but she did not maintain a copy of it. RT 15:32. She then testified about the contents of the letter. She stated that it said that the DEA had been monitoring Petitioner and his family for several years and had been investigating whether any of them was involved in the murder of Camarena. RT 15:33. Fuentes said that, in the letter, Petitioner wrote about the dates they were in Mexico -- January 23 to February 7, 1985. RT 15:36. The government claims this letter was an attempt by Petitioner to create an alibi for his whereabouts on January 30, 1985, the date of the La Langosta murders. *See* Gov't Opp'n, Pg. 32.

\*　　　　　　\*　　　　　　\*

Collectively, this evidence was sufficient to support a finding that Portioner participated in the Walker-Radelat murders.

> 3. <u>Whether Malone's Forensic Testimony was Material to Petitioner's Conviction for Committing a Violent Crime in Aid of a Racketeering Enterprise</u>

The government argues that, independent of the testimony of Malone, there was sufficient evidence at trial to support a finding that Petitioner was guilty of committing violent crimes in aid of a racketeering enterprise, in violation of 18 U.S.C. § 1959. The government was required to present evidence sufficient to show beyond a reasonable doubt that: the Cartel existed; it was a racketeering enterprise engaged in drug trafficking; Petitioner participated in the murders of Walker and Radelat; and Petitioner acted for the purpose of promoting his position in the Cartel. *United States v. Vasquez-Velasco*, 15 F.3d at 833.

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|---|---|---|---|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

The government argues that when viewed in the context of all of the trial evidence, Malone's forensic testimony was not material to, or necessary for, Petitioner's convictions. This evidence includes the direct testimony of Cervantes and Plascencia, Petitioner's inculpatory statements to Reynoso, Fuentes' testimony about Petitioner's letter and the circumstantial evidence about the DEA's enforcement activities.

The Ninth Circuit determined that the evidence summarized above was sufficient to support the jury's conclusion that Petitioner participated in the murders of Walker and Radelat in aid of a racketeering enterprise. As stated in its opinion, "[i]n light of the extensive evidence as to the cartel's knowledge and behavior during the time of the murders, the only logical explanation for the cartel's murders of Walker and Radelat is" that they were in retaliation for the DEA's activities. *Vasquez-Velasco*, 15 F.3d at 843. It is also significant that the opinion does not refer to Malone's testimony in this analysis.

The sufficiency of the evidence standard that was applied during the direct appeal of Petitioner's convictions is different than the materiality standard that applies here. Even when there is sufficient unchallenged evidence to support a conviction, a motion under section 2255 may be granted. The Ninth Circuit has emphasized that the analysis under *Napue* requires that the unchallenged evidence be so "overwhelming" that a petitioner "cannot demonstrate that the alleged errors had a substantial and injurious effect or influence in determining the jury's verdict." *Jackson*, 513 F.3d at 1079 (internal quotation marks omitted). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hall v. Director of Corrections*, 343 F.3d 976, 983-84 (9th Cir. 2003).

The Ninth Circuit has also explained that *Napue* does not require relief when the evidence presented at trial is "sufficiently powerful and abundant" such that false testimony "could not have had any effect on the jury's determination." *Phillips v. Ornoski*, 673 F.3d 1168, 1191 (9th Cir. 2012). In *Phillips*, the issue was whether the disclosure of benefits provided to a witness in exchange for her testimony was material to the petitioner's murder conviction. There, the prosecution withheld the fact that the witness had been granted immunity. The Ninth Circuit held it was "unimaginable" that the jury would have found petitioner not guilty with or without the false testimony, and therefore, the *Napue* violations were not material to the jury's finding that petitioner was guilty of murder. *Phillips*, 673 F.3d at 1191. The evidence presented at trial included: (i) eye witness testimony identifying petitioner as the perpetrator; (ii) a tape recording in which petitioner told a friend that "a .45 sure did put a big hole right through [the victim]…"; and (iii) petitioner's flight to another state and efforts to evade detection. *Id*. In light of this extensive evidence, the Ninth Circuit concluded that, even if the credibility of the witness had been undermined, a reasonable juror still would have found petitioner guilty based on the foregoing evidence. *Id*.

Malone's testimony is not sufficient to warrant *Napue* relief. As in *Phillips*, it is not reasonable to conclude that the jury would have found Petitioner not guilty of participating in the murders of Walker and Radelat for the purpose of promoting his position in the Cartel. To show Petitioner participated in the murders, the government presented the eye-witness testimony of Plascencia, which placed

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|----------|------------|------|----------------|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

Petitioner at La Langosta. Cervantes testified that he saw Petitioner leave for La Langosta with Barba the night of the murders. He then testified that Petitioner came to La Quinta the next day and told Barba that the two Americans were killed. This corroborated Plascencia's testimony. There is additional evidence that supports this determination: (i) Petitioner's detailed statements to Reynoso about the events at La Langosta; (ii) Petitioner went into hiding after Fonseca's arrest; and (iii) Petitioner's letter to his then wife. Therefore, even if Malone's testimony undermined Cervantes' testimony, it would not have had an effect on the jury's determination as to Petitioner's participation in the Walker-Radelat murders.

There was also compelling evidence that Petitioner acted for the purpose of promoting his position in the Cartel. As noted, the purpose of the conduct was to retaliate against the DEA for the substantial financial harm to the Cartel caused by DEA enforcement activities in Mexico. At trial, the government presented extensive testimony from DEA officials regarding the financial losses the Cartel suffered due to the seizures of marijuana, as well as evidence as to the Cartel's actions against informants. RT 1:152-55; 5:173-75. The retaliation theory was also supported by Petitioner's statements and Cervantes' testimony. Viewing this evidence collectively shows that Petitioner cannot show that Malone's false testimony had a substantial and injurious effect with respect to any finding by the jury on the issues related to the determination that Petitioner was guilty.

Petitioner relies substantially on this Court's decision in *Matta* to support his argument that Malone corroborated Cervantes testimony, which in turn materially affected the findings as to Petitioner. The decision in *Matta* concluded that Malone's testimony directly linked Matta to the horrific conduct with respect to the alleged conspiracy to abduct Camarena. Thus, Malone testified that Matta's hair was located in the room where the conduct allegedly occurred. As stated in the opinion:

> This nexus is significant because it was the only evidence that [Matta] was at the location. This substantially bolstered the testimony of Cervantes concerning Matta's presence on two occasions when the alleged conspiracy was discussed. That testimony was offered to support the allegation that [Matta] knew of, and agreed to participate in, the alleged conspiracy to kidnap and interrogate Camarena.

*Matta-Ballesteros*, CV 2596, Dkt. 37 at *23.

The opinion also concluded that Cervantes' testimony provided only circumstantial evidence that Matta was part of the conspiracy. Therefore, it was material that Malone's testimony placed Matta at the location where some of the most significant acts of the alleged conspiracy occurred. This corroborated Cervantes' testimony that Matta attended the relevant meetings.

Unlike Matta, Petitioner was neither charged nor convicted of conspiracy. Rather, his convictions were based on his role in the Walker-Radelat murders. Malone's testimony was not material to this conduct. It did not place Petitioner at La Langosta. Nor did it serve in any manner to corroborate Cervantes' testimony that Petitioner left for the restaurant with Barba. The materiality standard under *Napue* is evaluated first by considering the intended and actual use of the false evidence. It then turns to whether that evidence was corroborated by non-tainted evidence, or sufficiently impeached. If so, it is not

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|----------|---------------------------------------------|------|----------------|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

reasonably likely that the false evidence could have affected the jury's verdict. *See Blumberg v. Garcia*, 687 F. Supp. 2d 1074, 1115 (C.D. Cal. 2010). At trial, the government's intended and actual use of Malone's testimony was to seek to establish the guilt of Petitioner's co-defendants with respect to their actions in the alleged kidnapping and murder of Camarena. Although Malone corroborated Cervantes' testimony that certain co-defendants attended meetings among the alleged co-conspirators, that was not material to Petitioner's convictions. The government provided sufficient, non-tainted evidence to show that Petitioner participated in the Walker-Radelat murders. This included the aforementioned testimony of Plascencia and Petitioner's statements to Reynoso. Therefore, it is not reasonably likely that Malone's testimony affected the decision by the jury to convict Petitioner of violating section 1959.

The decision in *Matta* relied on *Hayes v. Brown*, 399 F.3d at 988. In *Hayes*, petitioner stabbed the manager of the hotel where he was staying, causing the death of the victim. The petitioner also took approximately 60 cartons of cigarettes from the office of the hotel. *Hayes*, 399 F.3d at 975. After the attack on the manager, the petitioner told his friend ("James") who was also staying at the hotel, that he had killed the manager. *Id*. Before trial, the prosecutor reached an agreement with counsel for James to grant transactional immunity as to James's involvement in the homicide and to dismiss three pending unrelated felony charges against James. *Id*. at 976. The prosecution and counsel for James did not tell James about this agreement so that James could testify that there was no such agreement in place, which was consistent with his knowledge at that time. *Id*.

At trial, James unknowingly, falsely testified that he had not received any immunity with respect to his other pending felony charges in exchange for his testimony. *Id*. at 979. The Ninth Circuit concluded that the prosecutor's actions amounted to knowing presentation of false evidence notwithstanding that James did not commit perjury. *Id*. at 980–81. Applying the "any reasonable likelihood" standard, the court considered the omission material because James was the "centerpiece of the prosecution's case" and almost all of the remaining evidence against petitioner was circumstantial. *Id*. at 985–86. Thus, without James's testimony, "an entirely different trial would have occurred" because James would have been subject to impeachment based on the agreement by the prosecutors not to pursue certain charges that had been brought against him. It was also significant that the existence of the agreement was kept from the jury. *Id*. at 988.

Unlike *Hayes* and *Matta*, Cervantes' testimony was not the "centerpiece of the prosecution's case." The government relied on Petitioner's own statements to Reynoso, Plascencia's testimony and the testimony about the DEA enforcement activities to show Walker and Radelat were murdered in retaliation for the enforcement actions of the DEA This evidence was alone sufficient to support the conviction of Petitioner under section 1959. *See United States v. Bracy*, 67 F.3d 1421, 1430 (9th Cir. 1995) ("[c]ommission of a single predicate act is sufficient to trigger the provisions of § 1959); *United States v. Butler*, 278 F. Supp. 3d 461, 482 (D.D.C. 2017) (finding the FBI Agent's false hair analysis testimony not "demonstrably important" where the prosecution relied on the comprehensive testimony of two witnesses supported by extrinsic corroboration).The jury heard significant testimony about the DEA's enforcement actions and Petitioners' involvement in the Cartel. This was sufficient to support the government's retaliation theory. Although scientific expert testimony can be "both powerful and quite misleading," *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993), the false testimony by Malone did not offer material support for that provided by Cervantes. This determination is reinforced

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-09685 JAK<br>LA CR87-00422 JAK (12) | Date | March 25, 2019 |
|---|---|---|---|
| Title | Javier Vasquez-Velasco v. United States of America<br>United States of America v. Javier Vasquez-Velasco | | |

because Reynoso and Plascencia corroborated the testimony of Cervantes. *See, e.g., Banks v. Dretke*, 540 U.S. 668, 700 (2004) (impeachment evidence was material where it was related to a witness whose testimony was "crucial to the prosecution" and was in the prosecution's own judgment "of the utmost significance"); *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir.1997) (en banc) (impeachment evidence was material where it pertained to "the prosecution's star witness").

The outcome is the same as to the possibility that the testimony of Malone corroborated that of Cervantes regarding the meetings at Lope de Vega. Although Cervantes testified that Petitioner attended events at La Quinta, he did not testify that Petitioner attended any meetings at Lope de Vega. That the government highlighted the importance of the testimony by Malone in its closing arguments, including that it "corroborates Cervantes when he tells you these meetings occurred" is not material to the issues presented here. This statement does not refer to Petitioner. RT 30A:58. Instead, viewing this argument in context shows that it was directed only to co-defendant Matta. Thus, the statement was made in the context of a lengthy and detailed discussion about Matta's alleged wrongdoing. *See* 30A:55-60; *Frady*, 456 U.S. at 169 (materiality must "be evaluated in the total context of the events at trial); *Paradis v. Arave*, 130 F.3d 385, 393 (9th Cir. 1997) ("[t]o ascertain the level to which such errors taint the constitutional sufficiency of the trial, they must "be evaluated in the total context of the events at trial").

There is no reasonable likelihood that Malone's testimony could have affected the judgment of the jury with respect to the verdicts on Counts One and Two as to Petitioner. The evidence supporting the verdict as to the violation of 18 U.S.C. § 1959 is very substantial. Accordingly, Petitioner has not shown that Malone's purported corroboration of Cervantes' testimony had a "substantial and injurious effect" on the jury's verdict. *See Jackson*, 513 F.3d at 1079.

## IV.   Conclusion

For the reasons stated in this Order, the Petition is **DENIED.**

**IT IS SO ORDERED.**

 

 

| | : |
|---|---|
| Initials of Preparer | ak |